## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OWNER OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.; NATIONAL MOTORISTS ASSOCIATION; MARION L. SPRAY; B.L. REEVER TRANSPORT, INC.; FLAT ROCK TRANSPORTATION, LLC; MILLIGAN TRUCKING, INC.; FRANK SCAVO; and LAURENCE G. TARR | : : : : : : : : : | Complaint – Class Action <br><br> Case No. |
| Plaintiffs, | : : | |
| vs. | : | Electronically Filed Document |
| PENNSYLVANIA TURNPIKE COMMISSION, LESLIE S. RICHARDS, in her individual capacity and her official capacities as Chair of the PTC and Secretary of the Department of Transportation; WILLIAM K. LIEBERMAN, in his individual capacity and his official capacity as Vice Chair of the PTC; BARRY T. DREW, in his individual capacity and his official capacity as Secretary-Treasurer of the PTC; PASQUALE T. DEON SR. in his individual capacity and his official capacity as Commissioner of the PTC; JOHN N. WOZNIAK, in his individual capacity and his official capacity as Commissioner of the PTC; MARK P. COMPTON, in his individual capacity and his official capacity as Chief Executive Officer of the PTC; CRAIG R. SHUEY, in his individual capacity and his official capacity as Chief Operating Officer of the PTC; and TOM WOLF, Governor of the Commonwealth of Pennsylvania, in his individual capacity and his official capacity as Governor | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | |
| Defendants. | : | |

## CLASS ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs, Owner Operator Independent Drivers Association, Inc. (OOIDA), National Motorists Association (NMA), Marion L. Spray, B.L. Reever Transport, Inc., Flat Rock Transportation, LLC, Milligan Trucking, Inc., Frank Scavo, and Laurence G. Tarr, by and through their undersigned attorneys, allege as follows:

## NATURE OF THE CASE

1.     Plaintiffs challenge the constitutionality of the imposition of excessive tolls by the Pennsylvania Turnpike Commission (PTC) on named Plaintiffs and on the members of the putative class of motor carriers, drivers, and motorists operating on the Pennsylvania Turnpike that Plaintiffs seek to represent.

2.     Charges imposed by a government entity on individuals for the use of specific facilities or services provided by the government entity are called "user fees."

3.     A user fee may constitute an undue burden on commerce when the amount of such fee exceeds a fair approximation of the value of the use of facilities or services conferred or when the fee is excessive in relation to the cost incurred by the government entity in providing the facility or services.

4.     By statute, PTC is directed to provide hundreds of millions of dollars in annual subsidies for non-Turnpike-related state projects and to pay for

2

those subsidies by raising toll rates on Plaintiffs and other users of the Pennsylvania Turnpike.

5.      The tolls imposed by PTC far exceed the value of the use of the facilities or services conferred on the operators of motor vehicles using the Pennsylvania Turnpike and far exceed the costs incurred to operate and maintain the Pennsylvania Turnpike System.

6.      The rate of tolls imposed by PTC is established expressly to underwrite Commonwealth expenses supporting facilities having no functional relationship to the operation, maintenance, or improvement of the Pennsylvania Turnpike.

7.      The tolls imposed upon those who use the Pennsylvania Turnpike are an undue burden on interstate commerce in violation of Article I, Section 8, Clause 3 of the United States Constitution, the Commerce Clause, and an impairment on the right of persons to travel.

8.      Plaintiffs seek declaratory and injunctive relief, damages, and such other relief as this Court may deem appropriate.

## PARTIES

### Plaintiffs

9.      OOIDA is a not-for-profit corporation incorporated in the State of Missouri, with its headquarters located at 1 N.W. OOIDA Drive, P.O. Box 1000,

Grain Valley, Missouri 64029.   OOIDA was founded in 1973 and has approximately 160,000 members residing in all fifty states.   OOIDA's members include owner-operators who own and operate their own trucking businesses, either leasing their commercial motor vehicles (CMVs) and services to a motor carrier that hauls freight under its own state or federal operating authority or hauling freight under their own state or federal operating authority.   Typically, OOIDA members are CMV operators (truck drivers) or small business trucking companies.   OOIDA's membership includes individuals who conduct at least a portion of their business in Pennsylvania and who operate their vehicles over the Pennsylvania Turnpike.   These individuals are required to pay and have paid tolls imposed upon the use of the Pennsylvania Turnpike by PTC.

10.   OOIDA is acting herein in a representative capacity seeking, among other things, declaratory and injunctive relief on behalf of its members, including several of the named Plaintiffs, and similarly situated CMV drivers and motor carriers who operate from time-to-time within the Commonwealth of Pennsylvania, and who pay tolls imposed by PTC for their use of the Pennsylvania Turnpike.   The interests OOIDA seeks to protect are germane to the purposes for which it exists.

11.   NMA is a not-for-profit organization with its headquarters located at 402 W. 2nd Street, Waunakee, Wisconsin 53597.   NMA was founded in 1982

4

and has members, typically licensed drivers (motorists), who number in the thousands and who are active in all fifty states.   NMA's membership includes individuals who drive their vehicles over the Pennsylvania Turnpike.   These individuals are required to pay and have paid tolls imposed upon their use of the Pennsylvania Turnpike by PTC.

12.   NMA is acting herein in a representative capacity seeking, among other things, declaratory and injunctive relief on behalf of its members, including several of the named Plaintiffs, and similarly situated motorists who operate from time-to-time within the Commonwealth of Pennsylvania and who pay tolls imposed by PTC on their use of the Pennsylvania Turnpike.   The interests NMA seeks to protect are germane to the purposes for which it exists.

13.   Plaintiff B.L. Reever Transport, Inc., (B.L. Reever) is a small business motor carrier registered with and authorized by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration to haul property in interstate commerce under U.S. DOT number 221269.   B.L. Reever is owned by Monte L. Wiederhold and is based in Maumee, Ohio.   B.L. Reever's commercial motor vehicles routinely transport property in interstate commerce on the Pennsylvania Turnpike to, from, or through the Commonwealth of Pennsylvania.   B.L. Reever has paid tolls on the Pennsylvania Turnpike in each of the last 5 years.   Monte L. Wiederhold is a member of OOIDA.

14.    Plaintiff Mr. Marion L. Spray is an owner-operator driver of a commercial motor vehicle in interstate commerce.   Mr. Spray resides at 5539 E. U.S. 22 & 3, Morrow, Ohio 45152.   Mr. Spray is an OOIDA member who routinely operates his CMV as a driver hauling freight for B.L. Reever, identified above as a small business motor carrier authorized to haul property in interstate commerce.   Mr. Spray routinely transports property on the Pennsylvania Turnpike to, from, or through the Commonwealth of Pennsylvania.   Mr. Spray has paid tolls on the Pennsylvania Turnpike for at least the last two years.

15.    Plaintiff Flat Rock Transportation, LLC (Flat Rock) is a small business motor carrier registered with and authorized by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration to haul property in interstate commerce under U.S. DOT number 838773.   Flat Rock is owned by Floyd F. Hillery, Jr. and is based in Bruceton Mills, West Virginia.   Flat Rock's commercial motor vehicle routinely transports property in interstate commerce on the Pennsylvania Turnpike to, from, and through the Commonwealth of Pennsylvania.   Flat Rock has paid tolls, using both cash and the E-ZPass System, on the Pennsylvania Turnpike for many years, including in each of the last five years.   Floyd F. Hillery, Jr. is a member of OOIDA.

16.    Plaintiff Milligan Trucking, Inc. (Milligan) is an owner-operator of a commercial motor vehicle in interstate commerce.   Milligan is owned by Jesse

Milligan and is based in Coshocton, Ohio.   Mr. Milligan is an OOIDA member who routinely operates his CMV as a driver hauling freight for Landstar Ranger Inc., a motor carrier authorized to haul property in interstate commerce under U.S. DOT number 241572.   Milligan's commercial motor vehicle routinely transports property in interstate commerce on the Pennsylvania Turnpike to, from, and through the Commonwealth of Pennsylvania.   Milligan has paid tolls, using both cash and the E-ZPass System, on the Pennsylvania Turnpike for many years, including in each of the last five years.

17.    Plaintiff Frank Scavo drives a private vehicle and resides in 101 Fred Street, Old Forge, Pennsylvania 18518.   Mr. Scavo is an NMA member who routinely operates his vehicle on the Pennsylvania Turnpike.   Mr. Scavo has paid tolls using the E-ZPass System on the Pennsylvania Turnpike for at least the last dozen years.

18.    Plaintiff Laurence G. Tarr drives a private vehicle and resides in East Greenville, Pennsylvania.   Mr. Tarr is an NMA member who routinely operates his vehicle on the Pennsylvania Turnpike.   Mr. Tarr has paid tolls using the E-ZPass System on the Pennsylvania Turnpike for at least the last two years.

**Defendants**

19.    Defendant PTC is an entity organized under the Pennsylvania

Turnpike Commission Act, 36 P.S. §§ 652a *et seq*., and the Turnpike Organization, Extension, and Toll Road Conversion Act. 74 Pa. C.S. §§ 8101 *et seq*. The principal office of PTC is located in Harrisburg, Pennsylvania.

20.     PTC is not immune from suits for damages under the Eleventh Amendment of the U.S. Constitution.

21.     Defendant Leslie S. Richards, Secretary of the Pennsylvania Department of Transportation (PennDOT), is the Commission Chair of PTC. Defendant Richards is sued here in her individual capacity and in her official capacities as Commission Chair of PTC and as Secretary of PennDOT.

22.     Defendant William K. Lieberman is the Commission Vice Chair of PTC. Defendant Lieberman is sued here in his individual and official capacities.

23.     Defendant Barry T. Drew is the Secretary-Treasurer of PTC and is a Commissioner. Defendant Drew is sued here in his individual and official capacities.

24.     Defendant Pasquale T. Deon, Sr. is a Commissioner of PTC. Defendant Deon is sued here in his individual and official capacities.

25.     Defendant John N. Wozniak is a Commissioner of PTC. Defendant Wozniak is sued here in his individual and official capacities.

26.     Defendant Mark P. Compton is Chief Executive Officer of PTC.

Defendant Compton is sued here in his individual and official capacities.

27.    Defendant Craig R. Shuey is the Chief Operating Officer of PTC. Defendant Shuey is sued here in his individual and official capacities.

28.    Defendant Tom Wolf (Governor Wolf) is the Governor of the Commonwealth of Pennsylvania.   Governor Wolf's principal office is located in Harrisburg, Pennsylvania.   Under Article IV, Section 2 of the Pennsylvania Constitution, the "supreme executive power" of the Commonwealth is vested in Governor Wolf, "who shall take care that the laws be faithfully executed."

## JURISDICTION AND VENUE

29.    This case arises under Article I, Section 8, Clause 3 of the United States Constitution (the Commerce Clause), Article IV, Section 2, Clause 1 (the Privileges and Immunities Clause), the Due Process Clause of the Fourteenth Amendment, and 42 U.S.C. §§ 1983 and 1988.   This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

30.    This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties within the original jurisdiction of the court that are so related to claims in this action that they form part of the same case or controversy.

31.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), because each of the Defendants (in their official capacities) resides in Dauphin County,

Pennsylvania.

## FACTUAL BACKGROUND COMMON TO ALL CLAIMS FOR RELIEF

### The Pennsylvania Turnpike Commission

32.    Pennsylvania law created PTC as "an instrumentality of the Commonwealth."   36 P.S. § 652d.

33.    Damages awarded to the Plaintiffs and the putative class that Plaintiffs seek to represent will be payable by PTC, not by the Commonwealth of Pennsylvania.

34.    The financial obligations of PTC are not backed by the full faith and credit of the Commonwealth of Pennsylvania.   74 Pa. C.S. § 8104.

35.    PTC, its Commissioners, and its Executive Officers are persons acting under the color of state law within the meaning of 42 U.S.C. § 1983.

36.    PTC is responsible for "fix[ing] and . . . revis[ing] . . . tolls for the use of the turnpike . . . , and . . . charg[ing] and collect[ing] the same."   36 P.S. § 652l; *see also* 74 Pa. C.S. § 8116(a).

37.    Tolls imposed by PTC upon users of the Pennsylvania Turnpike are user fees.

38.    General policy-making authority within PTC is vested in its five commissioners.

39.    General supervisory authority to implement PTC's policies and

statutory responsibilities is vested in its Chief Operating Officer and Chief Executive Officer.

40.     74 Pa. C.S. § 8116(a)(3) imposes upon PTC the obligation to fix and adjust tolls to generate funds for services and facilities provided by the Commonwealth of Pennsylvania:

> **(a) Establishment and changes in toll amounts—**
> \* \* \* \*
> Tolls shall be fixed and adjusted as to provide funds at least sufficient with other revenues of the Pennsylvania Turnpike System, if any, to pay all of the following:
> \* \* \* \*
> *(3) Amounts due to the department under 75 Pa.C.S. Ch. 89 (relating to Pennsylvania Turnpike) and pursuant to the lease agreement under 75 Pa.C.S.A § 8915.3 (relating to lease of Interstate 80; related agreements).*
> \* \* \* \*
> (5) Any other amounts payable to the Commonwealth or to the department.

74 Pa. C.S. § 8116(a) (emphasis added).

41.     The Pennsylvania Turnpike is a toll road operated by PTC.  It is a controlled-access highway that runs for 359 miles across the state.  The Mainline Pennsylvania Turnpike begins at the Ohio state line in Lawrence County.   It ends at the New Jersey border at the Delaware River Bridge in Bucks County.   In its entirety, the Pennsylvania Turnpike System covers 552 miles with its Northeastern Extension and Western Extensions.

42.     In the fiscal year ending May 31, 2015, a total of 192 million

vehicles traveled on the Turnpike.   166 million of these were Class 1 Passenger vehicles and 26 million were Classes 2-9 commercial vehicles.

43.   It is estimated that trucks represent about half of the annual toll revenues generated by the Turnpike even though trucks constitute less than 15 percent of total traffic.   In fiscal year 2016, trucks generated $443 million in toll revenue for PTC.

**The Act 44 and Act 89 Lease and Funding Agreements**

44.   Effective July 1, 2007, the Pennsylvania legislature enacted a statute known as Act 44.   PTC's Financial Report for 2017 and 2016 (2016-17 Financial Report) describes Act 44 as "creating a 'public-public partnership' between [PTC] and PennDOT to provide funding for roads, bridges and transit *throughout* the Commonwealth."   (Emphasis added.)

45.   A Lease and Funding Agreement (LAFA) to effectuate this partnership was entered into between PTC and PennDOT effective October 14, 2007.   The term of that agreement is fifty years.   75 Pa. C.S. § 8915.3(i).

46.   The Legislature amended Act 44 in 2013.   *See* Vehicles and Transportation—Omnibus Amendments, 2013 Pa. Legis. Serv. Act 2013-89 (H.B. 1060) (Act 89).   Unless otherwise indicated, references to Act 44/89 will refer to Act 44 as amended by Act 89.

47.   PTC and PennDOT amended the LAFA by entering into an

12

Amended Funding Agreement on April 4, 2014.   The amended agreement terminates in October 2057.

48.    The LAFA includes provisions pursuant to which PTC would lease Interstate 80 (I-80) from PennDOT and convert it to a toll road.

49.    In addition, the LAFA imposes significant financial obligations upon PTC to provide hundreds of millions of dollars annually to PennDOT.

50.    The transfer of I-80 from PennDOT to PTC was not implemented because the Federal Highway Administration never gave its required approval to convert I-80 to a toll road.   Nevertheless, significant financial obligations imposed upon PTC under Act 44/89, the LAFA, and the Amended Funding Agreement have been and are being implemented.

**Act 44 and Act 89 Payments**

51.    Act 44 requires PTC to make substantial annual payments to PennDOT, including "annual base payments," "annual additional payments," and "annual surplus payments."   75 Pa. C.S. § 8915.3(4), (5), (6).

52.    Act 44, as originally enacted, required PTC to make a "[s]cheduled annual commission contribution" to PennDOT in the following amounts:

**TABLE 1**

| Amount | Fiscal Year |
|---|---|
| $750,000,000 | 2007-2008 |
| $850,000,000 | 2008-2009 |
| $900,000,000 | 2009-2010 |
| Annual Increases of 2.5% | 2010 – End |

75 Pa. C.S. § 8901.

53.    PTC's obligation to pay PennDOT $900,000,000 (subject to annual increases of 2.5% per year) was amended by Act 89.

54.    Act 44/89 now requires PTC to make annual transfers to PennDOT in the amount of $450,000,000 between fiscal year 2011 and fiscal year 2022.   From fiscal year 2023 to 2057, the Act 44/89 transfers are scheduled to be $50,000,000 annually.

55.    According to the Pennsylvania Auditor General, PTC's per year payments to PennDOT through Fiscal Year 2057 under Act 44/89 will total $9.65 billion.

56.    As of January 4, 2018, PTC had made $5.875 billion in Act 44/89 payments to PennDOT.

57.    According to a September 2016 Report on the Pennsylvania Turnpike Commission by the Commonwealth's Department of the Auditor General, PTC has issued at least $5.6 billion in new debt in order to obtain funds to make its Act 44/89 payments.

58.     Through the end of the fiscal year ending on May 31, 2015, PTC had paid $1.28 billion in interest to fund the Act 44/89 payments to PennDOT.

59.     PTC's payments to PennDOT for obligations imposed upon it under Act 44/89 are comprised of cash payments made by it from time to time from its General Reserve Fund and cash transfers made by PTC from the proceeds of Subordinate Indenture Bonds issued pursuant to the Subordinate Trust Indenture dated April 1, 2008 as supplemented and amended from time to time.

60.     PTC cannot make the Act 44/89 payments imposed on it by statute without issuing debt in the form of the bonds, the service, and repayment, of which are to be derived entirely from PTC tolls.

61.     PTC is also responsible for providing debt service, including payment of interest on Subordinate Indenture Bonds and repayment of the principal on such bonds.

62.     Act 44/89 payments to PennDOT, interest, and bond expenses are classified by PTC as "non-operating expenses."

63.     The largest part of PTC's revenues are derived from tolls.  Tolls are pledged to secure the Commission's outstanding Senior Revenue Bonds, also known as Turnpike Revenue Bonds.

64.     PTC's toll revenue is not pledged to secure Subordinate Revenue Bonds.

65.    Funds transferred from PTC's General Reserve Fund to the Commission's Payment Fund originate from the proceeds of toll revenues after the Turnpike's operating expenses have been paid.

### PTC's Act 44/89 Payments to PennDOT Support Facilities and Programs That Have No Functional Relationship to the Pennsylvania Turnpike System

66.    Both Defendant Governor Wolf and Defendant Richards in her capacity as Secretary of PennDOT are responsible for faithfully executing the laws of the Commonwealth.

67.    Both Defendants Wolf and Richards may be held to account when the laws of the Commonwealth are found to be unconstitutional.

68.    Plaintiffs contend that Act 44/89 is facially unconstitutional or unconstitutional as applied.

69.    According to the Pennsylvania Department of the Auditor General's 2016 Performance Audit of PTC (Performance Audit), beginning in 2015, PTC's Act 44/89 payments have been dedicated solely to "non-highway purposes," including transit.

70.    The Pennsylvania Turnpike Commission Act 44 Financial Plan Fiscal Year 2018 dated June 1, 2017 (Act 44 Plan FY2018) makes this abundantly clear:

> Act 89 substantially altered the Commission's funding obligations to PennDOT. While the Commission's aggregate payment

16

obligation remains at $450 million annually, beginning July 1, 2014, *none of the payments are dedicated to highways and bridges. Instead, all $450 million is allocated to support transit capital, operating, multi-modal and other non-highway programs.*

(Emphasis added.)

71.     Pursuant to 74 Pa. C.S. § 1506, PTC's $450 million in annual payments to PennDOT must be deposited into "the Public Transportation Trust Fund," which must be dispersed amongst four PennDOT programs: the "operating program," "the Multimodal Transportation Fund," the "asset improvement program," and "programs of Statewide Significance."

72.     On December 4, 2008, PTC issued a press release regarding an imminent 25 percent toll increase:

In December 2008, PTC's CEO announced: "The mission of [the Turnpike] has changed . . . . For the first time, toll income isn't only going back into our toll roads, but helping to fund infrastructure improvements in every corner of Pennsylvania . . . . Toll increase proceeds are mainly earmarked for non-Turnpike projects, so the funds generated by this [2009 toll] increase will largely be used by PennDOT to help finance off-Turnpike road and bridge projects and the state's 74 mass-transit operations."

73.     In a December 30, 2008 press release by PTC, PTC's CEO acknowledged that: "In fact, more than 90 percent of the toll-increase proceeds will benefit non-Turnpike road and bridge projects and transit operations."

74.     Neither PTC, its Commissioners, nor its Executive Officers have authority to control the uses to which PTC's annual subsidies to PennDOT will

be put.

75.     There is no statutory requirement that PennDOT use the Act 44/89 payments it receives from PTC to underwrite projects that have a functional relationship with the Pennsylvania Turnpike.

76.     There are no statutory guidelines for determining whether facilities or services supported by PennDOT with Act 44/89 funds are functionally related to Turnpike facilities used by Plaintiffs and members of the class whom they seek to represent.

77.     Statutory provisions governing the Public Transportation Trust Fund, the Operating Program, the Asset Improvement Program, the Multimodal Fund, and Programs of Statewide Significance consistently identify programs eligible for grants of Act 44/89 funds that have no functional relationship with uses of the Pennsylvania Turnpike.

78.     Pursuant to 74 Pa. C.S. § 1513, the operating program pays for asset maintenance costs and other expenses incurred providing public passenger transportation inside the Commonwealth, including "free fares for senior passengers."   74 Pa. C.S. § 1513(c)(2)(B); *see also id.* § 1503 (defining "Operating expenses").

79.     Pursuant to 74 Pa. C.S. § 2104(a), the Multimodal Fund provides funds for "eligible programs" "related to" "aviation," "rail freight," "passenger

rail," "ports and waterways," and PennDOT's administration thereof.

      a.    74 Pa. C.S. § 2101 defines the Multimodal Funds' "Eligible program[s]" as "[a]ny of the following":

    (1)  A project which coordinates local land use with transportation assets to enhance existing communities.
    (2)  A project related to streetscape, lighting, sidewalk enhancement and pedestrian safety.
    (3)  A project improving connectivity or utilization of existing transportation assets.
    (4)  A project related to transit-oriented development[.]

80.    For the Asset Improvement Program, pursuant to 74 Pa. C.S. § 1514, "[e]ligible applicants . . . may apply for financial assistance for improvement, replacement or expansion of capital projects."

81.    "Any . . . person the department deems to be eligible" may apply, including "[a] local transportation organization," Commonwealth agencies and instrumentalities, and any "person responsible for coordinating community transportation program services."   74 Pa. C.S. § 1514(a).

82.    74 Pa. C.S. § 1503 defines "capital project" as:

A system or component of a system for the provision of public passenger transportation. The term includes vehicles; infrastructure power; passenger amenities; storage and maintenance buildings; parking facilities; the land on which any capital project is situated and the land needed to support it, whether owned in whole or in part; overhaul of vehicles; debt service; and the cost of issuance of bonds, notes and other evidences of indebtedness which a local transportation organization or transportation company is permitted to issue under any law of this Commonwealth.

19

83.    Pursuant to 74 Pa. C.S. § 1516, "Programs of Statewide significance shall include":

    (1)  The Persons with Disabilities Program;

    (2)  Intercity passenger rail and bus services;

    (3)  Community transportation capital and service stabilization;

    (4)  The Welfare-to-Work Program and matching funds for Federal programs with similar intent;

    (5)  Demonstration and research projects;

    (6)  Technical assistance;

    (7)  Other programs as determined by the department; and

    (8)  The department's costs under sections 1510(b) (relating to program oversight and administration) and 1518 (relating to program oversight and administration).

84.    Actual projects approved under these statutory provisions leave no doubt that these funded programs have no functional relationship to the Pennsylvania Turnpike.   By way of example, the following are some of the projects that have been funded by PennDOT using Act 44/89 toll revenues:

    a.    Development of Three Crossings, a mixed-use development consisting of residential units, office space, and a transportation facility with vehicle and bicycle parking, bicycle repair, electric-vehicle charging

20

stations, kayak storage, and transit station in Pittsburgh (Allegheny County);

b.      Construction of an underpass under U.S. 22, connecting the Lower Trail with Canoe Creek State Park (Blair County);

c.      Rehabilitation of nine stone-arch bridges along the SEPTA regional railway line (Regional project);

d.      Replacement of the roof at Collier Bus Garage (Allegheny County);

e.      Sidewalk installation along North Main Street in Yardley (Bucks County);

f.      Installation of approximately 1,800 feet of ADA-compliant sidewalk along the south side of Union Deposit Road between Shield Street and Powers Avenue at the Union Square Shopping Center in Susquehanna (Dauphin County);

g.      Extension of internal road, including final design, survey, permit modifications, bid documents, construction, storm water, street lights, project administration, legal expenses, audit expenses, and contingencies in Windy Ridge Business and Technology Park (Indiana County);

h.      Improvements to roadways in 12,000 acres of parks,

including widening shoulders, paving, signage installation, and bicycle marking in the Allegheny County Parks;

i.      Addition of eight curb ramps, new asphalt, four decorative crosswalks and a surface sign at an intersection in Latrobe (Westmoreland County);

j.      Phase II Construction of Erie Metropolitan Transportation Authority's Maintenance and Paratransit Bus Storage Facility (Erie County);

k.      Improvements to the Erie International Airport terminal building (Erie County);

l.      Creation of a multi-use trail and installing associated signage from the West End neighborhood linking existing bike routes to a multi-use path that connects to The Pennsylvania State University (Centre County);

m.      Creation of a pedestrian island at the intersection of Park Avenue and McKee Street in State College to provide a safer crossing for pedestrians and cyclists and accommodate the accessibility needs of vision-impaired residents (Centre County);

n.      Construction of a new two-way industrial access road, realigning a portion of the Nittany & Bald Eagle Railroad Main Line to

accommodate the access road, and constructing new sidings and operating tracks for First Quality Tissue's two existing facilities and a proposed new facility (Clinton County);

   o. Construction of an 85-car unit train loop track in the Keystone Regional Industrial Park to connect with an existing Norfolk Southern main line track and serve a Deerfield Farms Service grain elevator facility in Greenwood (Crawford County).

85. Plaintiffs do not attack the wisdom of the programs supported by Act 44/89 subsidies.   That task will be left for others.   If those programs have value, however, they should be paid for by taxpayers.   Funding these projects with toll receipts violates constitutional protections guaranteed to users of the Pennsylvania Turnpike.

### Payments by PTC Under Act 44/89 Are Supported by Tolls Imposed by the Pennsylvania Turnpike Commission

86. PTC derives almost all of its operating revenue from tolls.

87. In the 64 years prior to the enactment of Act 44, PTC raised the tolls on the Pennsylvania Turnpike only five times.

88. PTC does not have the financial resources to make Act 44/89 payments to PennDOT without continuously increasing toll rates and increasing debt.

89. PTC's plan for the Turnpike's financial future predicts that a 215

percent increase in toll revenue will be needed between 2015 and 2035 to fund

maintenance, improvements, operating expenses, and its Act 44/89 obligations

to PennDOT.

90.    In his Performance Audit, the Pennsylvania Auditor General

reported the "Actual (through 2016) and Expected Toll Increase Resulting from

Act 44/89" as follows:

**TABLE 2**

| Actual (through 2016) and Expected Toll Increase Resulting from Act 44/89 Calendar Year 2009 through 2044 | | | | | | |
|---|---|---|---|---|---|---|
| Year | Cash | E-ZPass | | | Cash | E-ZPass |
| 2009[15] | 25.0% | 25.0% | | 2027 | 3.5% | 3.5% |
| 2010 | 3.0% | 3.0% | | 2028 | 3.0% | 3.0% |
| 2011 | 10.0% | 3.0% | | 2029 | 3.0% | 3.0% |
| 2012 | 10.0% | - | | 2030 | 3.0% | 3.0% |
| 2013 | 10.0% | 2.0% | | 2031 | 3.0% | 3.0% |
| 2014 | 12.0% | 2.0% | | 2032 | 3.0% | 3.0% |
| 2015 | 5.0% | 5.0% | | 2033 | 3.0% | 3.0% |
| 2016 | 6.0% | 6.0% | | 2034 | 3.0% | 3.0% |
| 2017 | 6.0% | 6.0% | | 2035 | 3.0% | 3.0% |
| 2018 | 6.0% | 6.0% | | 2036 | 3.0% | 3.0% |
| 2019 | 6.0% | 6.0% | | 2037 | 3.0% | 3.0% |
| 2020 | 6.0% | 6.0% | | 2038 | 3.0% | 3.0% |
| 2021 | 5.0% | 5.0% | | 2039 | 3.0% | 3.0% |
| 2022 | 5.0% | 5.0% | | 2040 | 3.0% | 3.0% |
| 2023 | 5.0% | 5.0% | | 2041 | 3.0% | 3.0% |
| 2024 | 5.0% | 5.0% | | 2042 | 3.0% | 3.0% |
| 2025 | 5.0% | 5.0% | | 2043 | 3.0% | 3.0% |
| 2026 | 4.0% | 4.0% | | 2044 | 3.0% | 3.0% |

91.    In 2008, the PTC purportedly increased its tolls by 25 percent.

92.     From 2009 to 2016, tolls increased on average more than 10 percent each year for cash customers and 5.75 percent each year for E-ZPass customers.

93.     Table 3 shows the dollar impact of toll increases between 2006 and 2018 for tolls paid for by cash.   The toll has more than doubled for each vehicle toll class during this period.

**TABLE 3**
**2006-2018 INCREASE IN TOLLS MAINLINE ROADWAY**
**EAST TO WEST COMPLETE TRIP**
**DELAWARE RIVER BRIDGE (NJ BORDER) TO GATEWAY (OHIO BORDER)**

| Vehicle Toll Class | Gross Vehicle Weight (1000 lb) | 2006 Toll | 2018 Toll (Cash) | Increase |
|---|---|---|---|---|
| 1 | 1-7 | $ 21.25 | $ 47.55 | 223% |
| 2 | 7-15 | $ 31.25 | $ 69.85 | 223% |
| 3 | 15-19 | $ 39.00 | $ 84.35 | 216% |
| 4 | 19-30 | $ 45.25 | $ 101.15 | 223% |
| 5 | 30-45 | $ 63.75 | $ 141.85 | 222% |
| 6 | 45-62 | $ 80.75 | $ 177.90 | 220% |
| 7 | 62-80 | $ 115.25 | $ 254.70 | 220% |
| 8 | 80-100 | $ 150.75 | $ 333.85 | 221% |
| 9 | Over 100 | $ 861.00 | $ 1,836.40 | 213% |

94.     PTC plans to maximize the use of current toll revenues for its Act 44 transit obligations, projecting to use $50 million in cash funds annually to meet Act 44 obligations through 2057.

95.     Table 4 compares toll receipts reported by PTC for the past 11 years with the cost of operating and maintaining the Pennsylvania Turnpike System

during the same period. Since 2011, PTC's toll revenues have generally represented over 200 percent of the cost of operating and maintaining the Pennsylvania Turnpike System. Stated differently, PTC currently collects more than twice as much in tolls as is necessary to operate, maintain, and upgrade the Pennsylvania Turnpike System. *See* Table 4 below.

**TABLE 4**

| PTC | Cost of Turnpike Services | Gross Toll Revenue | Toll Revenue as a % of Cost of Services |
|---|---|---|---|
| 2007 | $ 369,855,000 | $ 617,616,000 | 166.99% |
| 2008 | $ 372,959,000 | $ 619,150,000 | 166.01% |
| 2009 | $ 393,364,000 | $ 638,244,000 | 162.25% |
| 2010 | $ 378,426,000 | $ 718,038,000 | 189.74% |
| 2011 | $ 359,870,000 | $ 763,856,000 | 212.26% |
| 2012 | $ 387,506,000 | $ 797,779,000 | 205.88% |
| 2013 | $ 412,484,000 | $ 821,740,000 | 199.22% |
| 2014 | $ 438,981,000 | $ 866,066,000 | 197.29% |
| 2015 | $ 459,780,000 | $ 934,252,000 | 203.20% |
| 2016 | $ 471,132,000 | $ 1,031,620,000 | 218.97% |
| 2017 | $ 517,103,000 | $ 1,114,976,000 | 215.62% |

96.    PTC tolls do not represent a fair approximation of the use of the Turnpike facilities provided, they are excessive in relation to the benefits conferred, and they significantly exceed the costs incurred by PTC to operate and maintain the Pennsylvania Turnpike System.

97.    PTC's tolls unduly burden interstate commerce by causing the Pennsylvania Turnpike System to be used as a revenue-generating facility designed to underwrite expenses incurred by PennDOT in providing services

and facilities throughout the Commonwealth that have no functional relationship to the Pennsylvania Turnpike System.

### Act 44/89 Unduly Limits Travel in the Commonwealth

98.    In his September 2016 Performance Audit of PTC, Eugene A. DePasquale, the Commonwealth's Auditor General, found that "**[a]nnual costly toll increases place an undue burden on Pennsylvanians.**"   (Emphasis in original.)

99.    In his Performance Audit, the Auditor General found that PTC's ability to raise toll revenue to make Act 44/89 payments to PennDOT is potentially unsustainable and that at some point, "the average turnpike traveler will be deterred by the increased cost and seek alternative toll-free routes." Auditor General DePasquale also pointed to evidence that stagnant traffic growth between 2004 and 2014 was due to toll increases between 2009 and 2014.   "The toll prices potentially are already nearing the point where certain consumers will find it too costly and avoid using the Pennsylvania Turnpike."

100.   The Auditor General's 2016 Performance Audit specifically recommended that PTC "[s]eek immediate relief from the legislature to further reduce or eliminate Act 44/89 required payments to PennDOT."

101.   The enforcement of Act 44/89 is official state action that impedes travelers' use of the Pennsylvania Turnpike System.

102.   The right to move freely, by automobile, is implicit in the concept of ordered liberty and finds ample support in the Commerce Clause, the Privileges and Immunities Clause, and the Due Process Clause of the Fourteenth Amendment.

103.   The economic burdens of the Act 44/89 payments fall exclusively on travelers paying the toll.

104.   The economic benefits from the Act 44/89 payments fall substantially on others who do not pay the toll.

105.   PTC's imposition of a toll inflated to guarantee the Act 44/89 payments to PennDOT to support facilities and services having no functional relationship to use of the Turnpike impairs Plaintiffs' and potential class members' constitutional right to travel.

106.   Defendants PTC, its Commissioners, and its Executive Officers have been fixing, revising, charging, and collecting the tolls from all vehicles using the Pennsylvania Turnpike, including motor carriers and drivers operating commercial motor vehicles on the Pennsylvania Turnpike as well as motorists using non-commercial vehicles.

## ALLEGATIONS RELATED TO DECLARATORY RELIEF

107.   An actual controversy exists between the parties to this proceeding with respect to whether, as the Plaintiffs contend, the tolls as established and

collected from users of the Pennsylvania Turnpike are excessive and are imposed for improper purposes thus constituting an undue burden on interstate commerce.   By contrast, in order to support the constitutionality of these tolls, each of the Defendants must contend that such tolls are reasonable and imposed only to support services and facilities that have a functional relationship with the Pennsylvania Turnpike.

108.   For reasons set forth above, Plaintiffs seek a declaratory judgment that Act 44, as amended by Act 89, is unconstitutional under the Commerce Clause facially or as applied.

109.   Plaintiffs have a direct, substantial, and immediate interest in the resolution of the questions of (1) whether tolls previously and currently imposed upon users of the Pennsylvania Turnpike constitute an undue burden on interstate commerce and (2) whether tolls previously and currently imposed unconstitutionally limit and impede the right of persons to travel freely through the Commonwealth of Pennsylvania.

110.   Declaratory relief from this Court will resolve an actual dispute between the parties with respect to the constitutionality of the tolls imposed by PTC on persons using the Pennsylvania Turnpike.

## **ALLEGATIONS RELATED TO INJUNCTIVE RELIEF**

111.   Defendants, acting under color of state law, have imposed and are

imposing excessive tolls on users of the Pennsylvania Turnpike.  By statute, PTC is required to transfer to PennDOT the excess toll receipts it acquires to subsidize services and facilities provided by the Commonwealth of Pennsylvania that have no functional relationship to the Pennsylvania Turnpike System.   These actions by Defendants constitute an undue burden on interstate commerce.

112.   Plaintiffs have a substantial likelihood of success on the merits of their claims.   There are virtually no material factual issues in dispute.   PTC, PennDOT, and other officers and agencies of the Commonwealth have documented for the public record all of the relevant information necessary to establish that the tolls imposed by PTC are excessive and that those tolls are used to subsidize services and facilities provided by the Commonwealth that have no functional relationship to the Pennsylvania Turnpike.

113.   The unlawful conduct of Defendants is ongoing and is causing, and will continue to cause, irreparable harm to Plaintiffs and to all users of the Pennsylvania Turnpike.

114.   The balancing of interests between the parties tilts heavily in favor of Plaintiffs and other persons who are currently required to pay tolls that generate two times the amount of revenue required by PTC to operate and maintain the Pennsylvania Turnpike.

115.   The public interest will be well-served by eliminating the undue burden that Defendants are imposing on users of the Pennsylvania Turnpike.

## CLASS ACTION ALLEGATIONS

116.   Named Plaintiffs seek to represent a class comprising:

a.      All persons or entities who, at any time within the two years preceding the filing of this action until the date when any final non-appealable judgment is entered, operated a commercial motor vehicle or vehicles in Vehicle Toll Classes 2-9 on the Pennsylvania Turnpike System and who paid tolls to PTC using the E-ZPass payment system for that opportunity.

b.      All persons or entities who, at any time within the two years preceding the filing of this action until the date when any final non-appealable judgment is entered, operated a motor vehicle or vehicles in Vehicle Toll Class 1 on the Pennsylvania Turnpike System and who paid tolls to PTC using the E-ZPass payment system for that opportunity.

c.      All persons or entities who, at any time within the two years preceding the filing of this action until the date when any final non-appealable judgment is entered, operated a motor vehicle on the Pennsylvania Turnpike System and who have a written receipt for tolls paid or a federal or state tax return documenting the payment of tolls to

PTC.

117.   This action, brought by Plaintiffs as a class action, on their own behalf and on behalf of all others similarly situated, meets the prerequisites for a class action under Fed. R. Civ. Proc. 23.

a.   **NUMEROSITY:** Pursuant to Fed. R. Civ. P. 23(a)(1), the Class is too numerous for practicable joinder. The members of the Plaintiff Class comprise tens of thousands of operators of commercial motor vehicles and tens of thousands of motorists who operate private vehicles on the Pennsylvania Turnpike and who have paid and/or will become liable to pay excessive tolls.

b.   **TYPICALITY:** Pursuant to Fed. R. Civ. P. 23(a)(3), the claims of the representative parties who have paid or will pay the challenged toll are typical of the claims of all members of the Class.

i.   Named Plaintiffs and all class members are subject to ongoing harm by the same wrongful imposition of the excessive toll.

ii.   Plaintiffs' claims are the result of Defendants' same practices and course of conduct that gave rise to the claims of the class members, and Plaintiffs' claims are based on the same legal theories.

32

c.     **ADEQUACY OF REPRESENTATION:** Pursuant to Fed. R. Civ. P. 23(a)(4), Plaintiffs will fairly and adequately assert and protect the interests of all members of the Class.

    i.   Plaintiffs' attorneys are experienced class action litigators who will adequately represent the interests of the class.

    ii.  Plaintiffs' interest in obtaining compensatory damages and injunctive and declaratory relief for violations of their constitutional rights and privileges are consistent with, and do not conflict with, those of any potential class member.

    iii. Plaintiffs have adequate financial resources to assure the interests of the Class will not be harmed.

d.     **COMMONALITY:** Pursuant to Fed. R. Civ. P. 23(b)(3), common questions of law or fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

    i.   Common questions of law and fact are susceptible to generalized, class-wide proof.

    ii.  Common questions of law and fact include, but are not limited to:

        (a)   whether the toll imposes an unconstitutional

burden on interstate commerce for the commercial motor vehicles paying the toll;

(b) whether the toll impairs the constitutional right to travel of the motorists paying the toll;

(c) what benefits should be included within the constitutional analysis of PTC's toll;

(d) what services should be included within the constitutional analysis of PTC's toll;

(e) what are PTC's costs for maintaining its facilities;

(f) what are PTC's costs for providing services;

(g) whether the toll reflects a fair use of facilities by those paying the toll;

(h) the extent to which the toll exceeds the benefits PTC confers upon those paying the toll;

(i) the extent to which the toll exceeds the costs incurred by PTC to maintain the Pennsylvania Turnpike System; and

(j) whether the toll is sufficiently related to services provided by PTC to those who pay the toll.

e.     **UNIFORMITY OF ADJUDICATION:** Prosecution of separate actions would create the risk of inconsistent or varying adjudications, confronting PTC with incompatible standards of conduct, and such separate actions would likely impede or be found dispositive of interests of non-parties to the adjudications.

f.     **ASCERTAINABILITY:** Computerized records exist for all toll charges paid by individual class members who use the E-ZPass payment system or who use a credit card or debit card to make toll payments. As of 2017, at least 77 percent of the toll payments were being made to PTC through the E-ZPass payment system. Further, PTC issues written receipts upon request at the time of payment for tolls paid with cash. Toll payments by business entities like motor carriers are business expenses for which claims for federal and state tax deductions are included on tax returns. Thus, there are numerous sources of documentation available to identify excessive tolls paid by putative class members.

g.     **OTHER:**

i.     For potential class members, especially those who travel infrequently on the Pennsylvania Turnpike, compensatory damages, in the form of past toll payments, may be relatively small, making it uneconomical for individual

plaintiffs to adjudicate their individual claims.

ii.    On information and belief, Defendants have collected and will continue to collect tolls from persons using the Pennsylvania Turnpike System, making injunctive and declaratory relief appropriate with respect to the whole class.

## FIRST CAUSE OF ACTION
### (Violation of Commerce Clause)

118.   The allegations above are incorporated herein as if fully set forth below.

119.   The Commerce Clause of the U.S. Constitution provides that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States."   U.S. Const. art. I, § 8, cl. 3.

120.   The Commerce Clause prohibits state actions that unduly burden interstate commerce.

121.   The Commerce Clause requires that user fees like tolls: (1) may not discriminate against interstate commerce and travel; (2) must reflect a fair approximation of the use of facilities for whose benefit they are imposed; and (3) may not be excessive in relation to costs incurred by the imposing authority.

122.   PTC's imposition of tolls for use of the Pennsylvania Turnpike constitutes an undue burden on interstate commerce in violation of the

Commerce Clause because:

      a.    the tolls do not reflect a fair approximation of the use of Pennsylvania Turnpike facilities by those upon whom the tolls are imposed;

      b.    the annual toll revenues collected by PTC are excessive and currently represent over 200 percent of the actual cost of making the Pennsylvania Turnpike System available to users; and

      c.    more than half of the annual toll revenues by PTC collected are used to pay for services and facilities having no functional relationship to the operation and maintenance of the Pennsylvania Turnpike System.

123.   The statutory provisions of Act 44/89 are unconstitutional facially or as applied.

124.   Defendants, acting under color of state law, have deprived and continue to deprive Plaintiffs and putative class members of the right to engage in interstate commerce in violation of their rights under the Commerce Clause.

125.   Plaintiffs and class members have suffered and continue to suffer damages as a result of Defendants' imposition of the unconstitutional toll.

## SECOND CAUSE OF ACTION
### (Violation of the Constitutional Right to Travel)

126.   The allegations above are incorporated herein as if fully set forth below.

127.   The U.S. Constitution protects individuals' right to travel. Plaintiffs' right to travel is currently being impaired by Defendants.

128.   PTC's imposition of the excessive toll:

a.      unconstitutionally limits travelers' access to the Pennsylvania Turnpike;

b.      unduly burdens and impedes motorists' right to travel freely through the Commonwealth; and

c.      is currently discouraging both business and private travelers from using the Turnpike.

129.   Defendants, acting under color of state law, have imposed and continue to impose tolls that act as an unconstitutional impediment to Plaintiffs' and class members' right to travel.

130.   Plaintiffs and class members have suffered damages as a result of Defendants' imposition of the toll.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court issue judgment against the Defendants as follows:

1.      A Declaratory Judgment against each Defendant holding that PTC's imposition of excessive tolls for the use of the Pennsylvania Turnpike by motor carriers engaged in interstate commerce in

amounts specifically calculated to provide funds to support facilities and services having no functional relationship to the operation and maintenance of the Pennsylvania Turnpike System constitutes an undue burden on interstate commerce in violation of the Commerce Clause;

2.    A Declaratory Judgment against each Defendant holding that PTC's imposition of excessive tolls for the use of the Pennsylvania Turnpike by travelers in amounts specifically calculated to provide funds to support facilities and services having no functional relationship to the operation and maintenance of the Pennsylvania Turnpike System constitutes an unjustified impairment on their constitutional right to travel;

3.    A Declaratory Judgment against each Defendant that the provisions of Act 44, as amended by Act 89, that direct PTC to: (a) make payments to PennDOT to support facilities and services provided by the Commonwealth of Pennsylvania having no functional relation to the operation and maintenance of the Pennsylvania Turnpike, and (b) fund those payments with sums generated through the imposition of tolls upon users of the Pennsylvania Turnpike that do not represent a fair approximation of the use of Turnpike facilities,

violate the Commerce Clause of the United States Constitution both facially or as applied;

4.     A preliminary injunction enjoining Defendants PTC, its Commissioners, and its Executive Officers in their official capacities from: (a) expending any funds acquired through the imposition of tolls upon users of the Pennsylvania Turnpike System for any purpose other than as may be necessary to pay for the operation, maintenance of, and future improvements to the Pennsylvania Turnpike System; (b) requiring Defendants to segregate and safeguard all toll receipts in excess of what may be required for the current operation and maintenance of the Pennsylvania Turnpike System or for the funding of Turnpike Revenue Bonds issued under the Senior Indenture,[1] and prohibiting Defendants from expending those toll receipts, pending final ruling on Plaintiffs' claims in this action; and (c) authorizing any further Subordinate Bond issues or incurring any additional debt for the purpose of making any additional Act 44/89 payments to PennDOT;

---

[1] The "Senior Indenture" means the Amended and Restated Trust Indenture originally dated as of July 1, 1986 and amended and restated as of March 1, 2001 between PTC and U.S. National Bank Association, as successor trustee, as it may be amended, supplemented, or replaced, in connection with PTC's main line revenue toll bonds.

5.      A preliminary injunction: (a) enjoining Defendants Leslie S. Richards, in her official capacity as Secretary of PennDOT, and Tom Wolf, Governor of Pennsylvania, from further spending any funds acquired by PennDOT through Act 44/89 and (b) requiring Defendants to place all unexpended funds acquired through Act 44/89 payments in escrow pending final ruling on Plaintiffs claims in this action;

6.      A permanent injunction, enjoining Defendants PTC, its Commissioners, and its Executive Officers from imposing constitutionally excessive tolls upon users of the Pennsylvania Turnpike System;

7.      A permanent injunction, enjoining PTC from issuing any further bonds or incurring any additional debt for the purpose of making Act 44/89 payments;

8.      A permanent injunction prohibiting PTC from using toll revenues to make payments of interest or principal on outstanding bonds issued for the purpose of meeting its Act 44/89 obligations;

9.      A permanent injunction prohibiting Defendants Leslie S. Richards, in her official capacity as Secretary of PennDOT, and Tom Wolf, Governor of Pennsylvania, from enforcing Act 44/89 and from

demanding or receiving Act 44/89 payments;

10.    A judgment against Defendants PTC, its Commissioners, and its Executive Officers in favor of Plaintiffs and all putative class members awarding them refunds of all payments of tolls imposed upon their use of the Pennsylvania Turnpike System in excess of what was reasonably necessary to pay for the cost of operating and maintaining the Pennsylvania Turnpike, together with any legally applicable interest and other compensation;

11.    An order certifying this proceeding as a class action and appointing Plaintiffs as class representatives;

12.    An order awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law for counsel to Plaintiffs; and

13.    Granting such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Kevin J. McKeon*
Kevin J. McKeon ID No PA 30428
Dennis A. Whitaker ID No PA 53975
Melissa A. Chapaska ID No PA 319449
Hawke McKeon & Sniscak, LLP
100 North Tenth Street
Harrisburg, PA 17101
(717) 236-1300
(717) 236-4841 (f)
kjmckeon@hmslegal.com
dawhitaker@hmslegal.com
machapaska@hmslegal.com

Co-Counsel for Plaintiffs

Paul D. Cullen, Sr. ID No DC 100230*
Paul D. Cullen, Jr. ID No DC 463759*
Kathleen B. Havener ID No DC 432638*
The Cullen Law Firm, PLLC
1101 30th Street NW, Suite 300
Washington, DC 20007
(202) 944-8600
pdc@cullenlaw.com
pxc@cullenlaw.com
kbh@cullenlaw.com

Counsel for Plaintiffs
*Application for Pro Hac Vice to be filed*