# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OWNER OPERATOR INDEPENDENT | : | |
| DRIVERS ASSOCIATION, INC. *et al.*, | : | |
| | : | No. 1:18-cv-00608-YK |
| Plaintiffs, | : | |
| | : | (Judge Yvette Kane) |
| v. | : | |
| | : | |
| PENNSYLVANIA TURNPIKE | : | |
| COMMISSION *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF GOVERNOR TOM WOLF AND SECRETARY LESLIE S. RICHARDS*

Bruce P. Merenstein (Bar ID No. PA 82609)
    (application for admission forthcoming)
Arleigh P. Helfer III (Bar ID No. PA 84427)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 751-2249
Fax: (215) 751-2205

---

* This brief is submitted on behalf of Leslie S. Richards in her individual capacity and in her official capacity as Secretary of the Pennsylvania Department of Transportation.

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................1

Procedural History..........................................................................1

Statement of Facts ........................................................................3

Statement of Questions Involved.......................................................8

Argument ...................................................................................10

   I.   Plaintiffs' claims should be dismissed because they fail to state a claim that Act 44/89 violates the Dormant Commerce Clause or a right to travel ............................................................................10

      A.  Act 44/89 does not violate the Dormant Commerce Clause because Congress has specifically authorized state transportation authorities to use toll revenues for any purposes for which federal transportation funds may be used ......................11

      B.  Act 44/89 also does not violate the Dormant Commerce Clause because the statute does not discriminate against or burden interstate commerce .............................................................18

      C.  Act 44/89 does not violate plaintiffs' right to travel because it does not have the purpose or effect of deterring travel nor discriminate against any class of travelers ........................................24

  II.  To the extent that plaintiffs seek damages from Governor Wolf and Secretary Richards in either their official or individual capacities, such claims should be dismissed because they are barred by Eleventh Amendment and qualified immunity ...............27

      A.  Damages claims against a state's executive-branch officials such as a governor or cabinet secretary sued in their official capacities are barred by the Eleventh Amendment .........................28

      B.  Executive-branch officials sued in their individual capacities are immune from damages claims based on their carrying out of duly-enacted laws...................................................................30

III. Plaintiffs' claims against Governor Wolf and Secretary Richards in their individual capacities should be dismissed for failure to state a claim on which relief can be granted because the complaint does not allege that either of them misused or abused their positions while carrying out discretionary acts..........................32

   A. Executive-branch officials may be liable for damages in their individual capacities only when they misuse or abuse their official positions....................................................................................32

   B. Executive-branch officials cannot be sued in their individual capacities for prospective relief seeking to enjoin them from carrying out their official duties...........................................................34

Conclusion..............................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aero Mayflower Transit Co. v. Board of Railroad Comm'rs*, 332 U.S.
495 (1947) .................................................................................. 21-22

*American Trucking Ass'ns, Inc. v. New York State Thruway Auth.*,
886 F.3d 238 (2d Cir. 2018) ................................................... 17

*American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266 (1987) ...................... 20

*American Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167 (1990) ........................... 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... 26

*Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898 (1986) ................................. 25

*C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) ...................... 19

*Carroll v. Blinken*, 957 F.2d 991 (2d Cir. 1992) ...................................... 16

*Citizens in Charge, Inc. v. Husted*, 810 F.3d 437 (6th Cir. 2016) ...................... 31

*Clark v. Poor*, 274 U.S. 554 (1927) ....................................................... 21

*Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg.
Bd.*, 462 F.3d 249 (3d Cir. 2006) ......................................................... 14

*Cook v. Floyd*, 398 F. App'x 702 (3d Cir. 2010) ....................................... 29

*Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850
(3d Cir. 2014) ............................................................................. 30

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*,
405 U.S. 707 (1972) .............................................................. 20, 23, 26

*Finkelman v. NFL*, 810 F.3d 187 (3d Cir. 2016) ...................................... 26

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) ....................................... 30

*Hafer v. Melo*, 502 U.S. 21 (1991) ....................................................... 30

*Iles v. de Jongh*, 638 F.3d 169 (3d Cir. 2011) ......................................... 34

*Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813
(3d Cir. 1994) ...............................................................................18

*Laskaris v. Thornburgh*, 661 F.2d 23 (3d Cir. 1981) ............................29

*Lutz v. City of York*, 899 F.2d 255 (3d Cir. 1990) ...............................27

*Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862 (3d Cir. 2012).............. 11-12

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999) .................................. 26-27

*Morf v. Bingaman*, 298 U.S. 407 (1936) ............................................21

*Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994) ........................20

*Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310
(3d Cir. 2002) ...............................................................................34

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ................................ 18-19

*Saenz v. Roe*, 526 U.S. 489 (1999) ....................................................24

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ............................................32

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ...................................7

*Scott v. Beard*, 252 F. App'x 491 (3d Cir. 2007)..................................29

*Sossamon v. Texas*, 563 U.S. 277 (2011) ............................................29

*Thomas v. Independence Twp.*, 463 F.3d 285 (3d Cir. 2006) ................................33

*Town of Southold v. Town of E. Hampton*, 477 F.3d 38 (2d Cir. 2007) .................26

*United States v. Guest*, 383 U.S. 745 (1966) ........................................25

*Walker v. Beard*, 244 F. App'x 439 (3d Cir. 2007) ...............................33

*Wallach v. Brezenoff*, 930 F.2d 1070 (3d Cir. 1991)..............................26

*Weisshaus v. Port Auth. of N.Y. & N.J.*, No. 11-Civ.-6616, 2011
U.S. Dist. LEXIS 158650 (S.D.N.Y. Oct 24, 2011), *aff'd in
relevant part*, 497 F. App'x 102 (2d Cir. 2012) ...............................26

*Williams v. Secretary Pa. Dep't of Corr.*, 848 F.3d 549 (3d Cir.), *cert.
denied*, 138 S. Ct. 357 (2017) ....................................................31

*Wilson v. Schillinger*, 761 F.2d 921 (3d Cir. 1985)...............................30

iv

## Statutes and Rules

United States Session Laws

Fixing America's Surface Transportation Act, Pub. L. No.
114-94, 129 Stat. 1311 (2015) ....................................................................... 12-15

United States Code: Federal-Aid Highways

23 U.S.C. § 101(a)(29) (2014) .................................................... 13-14

23 U.S.C. § 129(a)(3)(A) ............................................................. 12, 14

23 U.S.C. § 133(b) ....................................................................... 12-16

23 U.S.C. § 133(b)(15) ...................................................................... 13

23 U.S.C. § 133(b) (2014) ................................................................. 14

23 U.S.C. § 137 ................................................................................. 12

23 U.S.C. § 146 ................................................................................. 12

23 U.S.C. § 206 ................................................................................. 12

23 U.S.C. § 217 ................................................................................. 12

United States Code: Public Transportation

49 U.S.C. § 5302(3) .......................................................................... 12

Pennsylvania Session Laws

Act of July 18, 2007, P.L. 169, No. 44 ...................................... *passim*

Act of Nov. 25, 2013, P.L. 974, No. 89 ..................................... *passim*

Pennsylvania Sovereign Immunity Law

1 PA. C.S. § 2310 ............................................................................ 29

Pennsylvania Judicial Code

42 PA. C.S. § 8521 .......................................................................... 29

42 PA. C.S. § 8522 .......................................................................... 29

Pennsylvania Public Transportation Law

74 PA. C.S. § 1506 ............................................................................ 4

74 Pa. C.S. § 1506(b) ...................................................................................6

74 Pa. C.S. § 1506(b)(1) ...............................................................................4

74 Pa. C.S. § 1506(c) ...................................................................................6

74 Pa. C.S. § 1506(c)(1) ...............................................................................7

74 Pa. C.S. § 1506(e) ...................................................................................6

74 Pa. C.S. § 1506(e)(1) ............................................................................5, 7

74 Pa. C.S. § 1506(e)(2) ............................................................................4, 7

74 Pa. C.S. § 1506(e)(3) ............................................................................5, 7

74 Pa. C.S. § 1506(e)(6) .......................................................................4-5, 15

74 Pa. C.S. § 1513 .......................................................................................5

74 Pa. C.S. § 1514 .......................................................................................4

74 Pa. C.S. § 1514(a)(1) ...............................................................................5

74 Pa. C.S. § 1514(e.1) .................................................................................5

74 Pa. C.S. § 1516 .......................................................................................5

74 Pa. C.S. § 2101 .......................................................................................6

74 Pa. C.S. § 2102 .....................................................................................4-5

74 Pa. C.S. § 2104 .....................................................................................15

74 Pa. C.S. § 2104(a)(1) ...............................................................................6

Pennsylvania Vehicle Code

75 Pa. C.S. § 1904(b) ...................................................................................6

75 Pa. C.S. § 1904(b)(3) ..........................................................................6, 15

75 Pa. C.S. § 8901 .......................................................................................4

75 Pa. C.S. § 8915.3 ....................................................................................4

Federal Rules of Civil Procedure

Fed. R. Civ. P. 12(b)(6) ...............................................................................3

## INTRODUCTION

Plaintiffs ignore an applicable federal statute and misread controlling precedent in order to assert their Dormant Commerce Clause and right-to-travel claims. When the federal statute and the longstanding precedent are applied to the facts pled in plaintiffs' complaint, the inexorable conclusion is that plaintiffs fail to state a claim against Governor Tom Wolf and Secretary Leslie Richards. Plaintiffs' complaint therefore should be dismissed in its entirety.

If the Court does not dismiss the complaint in its entirety, any damages claims and the claims against Governor Wolf and Secretary Richards in their individual capacities must be dismissed because the allegations involving Governor Wolf and Secretary Richards demonstrate that they are immune from any damages claims or claims against them in their individual capacities.

## PROCEDURAL HISTORY

Plaintiffs filed a class action complaint on March 15, 2018, challenging Pennsylvania legislation (Act 44/89) that requires the Pennsylvania

Turnpike Commission (PTC) to transfer a particular amount of revenue to the Pennsylvania Department of Transportation (PennDOT) each year.[1] Plaintiffs contend that the PTC imposes tolls on users of the Pennsylvania Turnpike that generate revenues in excess of the amount necessary to maintain and operate the Turnpike, and that it does so in order to raise sufficient funds to meet its obligations under Act 44/89.[2] According to plaintiffs, this imposition of allegedly excessive tolls and the use of the additional revenue to fund non-Turnpike projects violates the Dormant Commerce Clause of the United States Constitution, as well as the constitutional right to travel.[3]

Plaintiffs filed a motion for a preliminary injunction on April 2, 2018, seeking to preclude the PTC from making any further transfers to PennDOT pursuant to Act 44/89 until the conclusion of this litigation.[4] Defendants responded to that motion, but before the Court could act on it,

---

[1] Pl. Compl. (ECF No. 1) ¶¶ 1-8.

[2] Pl. Compl. ¶¶ 4-6.

[3] Pl. Compl. ¶ 7.

[4] ECF No. 19.

plaintiffs moved to withdraw their motion on April 20, 2018.[5] The Court

granted that motion to withdraw on April 24, 2018.[6]

Defendants Wolf and Richards (in her individual capacity and her

capacity as PennDOT Secretary) have now filed a motion to dismiss and

this supporting brief, seeking to have plaintiffs' complaint dismissed in its

entirety pursuant to Rule 12(b)(6).

### STATEMENT OF FACTS

In 2007, the Pennsylvania General Assembly enacted Act 44, which,

among other things, amended portions of the Pennsylvania Public

Transportation Law (Title 74) and Vehicle Code (Title 75).[7] Six years later,

the legislature enacted Act 89, which, again, amended the Public

Transportation Law and Vehicle Code.[8] As relevant here, Act 44/89

provides for payments from the PTC to PennDOT that, at the present time,

total $450 million annually, and will eventually decline to $50 million

---

[5] ECF Nos. 35, 36, 40.

[6] ECF No. 42.

[7] Act of July 18, 2007, P.L. 169, No. 44; *see also* Pl. Compl. ¶ 44.

[8] Act of Nov. 25, 2013, P.L. 974, No. 89; *see also* Pl. Compl. ¶ 46.

annually.[9] The PTC obtains the funds to make the annual Act 44/89 payments from Turnpike tolls, as well as from bonds it issues, the interest and principal of which is paid from tolls.[10]

Pursuant to Act 44/89, PennDOT deposits the payments from the PTC in one of two funds, the Public Transportation Trust Fund (PTTF) or the Multimodal Transportation Fund (MTF).[11] More than 93% of the funds, or $420 million currently, ends up in the PTTF, while the remainder goes to the MTF.[12] All of the money transferred from the PTC is eventually used to fund transportation projects throughout the Commonwealth.[13]

Most of the funds transferred by the PTC to PennDOT and deposited in the PTTF each year are used for public transportation capital improvement projects.[14] These funds are used for the "improvement, replacement or

---

[9] 75 PA. C.S. §§ 8901, 8915.3; *see also* Pl. Compl. ¶¶ 49, 51-54.

[10] Pl. Compl. ¶¶ 59-61, 63-65.

[11] 74 PA. C.S. §§ 1506, 2102. Technically, all of the funds are deposited in the PTTF, but $30 million of the funds deposited in the PTTF is transferred each year from the PTTF to the MTF. *See id.* § 1506(b)(1), (e)(6).

[12] 74 PA. C.S. § 1506(b)(1), (e)(6).

[13] *See generally* Public Transportation Law, 74 PA. C.S. §§ 1101-2107.

[14] 74 PA. C.S. §§ 1514, 1506(e)(2).

expansion of capital projects" related to public transportation.[15] Most of the funds are directed to southeastern Pennsylvania's public transportation agency, SEPTA, and the Port Authority of Allegheny County, while other mass transit agencies throughout the Commonwealth also receive such funding.[16]

A much smaller amount of the funds transferred from the PTC to PennDOT and placed in the PTTF is used for public transportation operating costs,[17] and the smallest amount (less than 5%) goes to "programs of statewide significance," a category that includes such projects as reduced fares to persons with disabilities; intercity passenger rail and bus services; and community transportation capital assistance.[18]

As noted, $30 million, or less than 7% of the funds transferred from the PTC to PennDOT, is deposited in the MTF.[19] The MTF contributes to transportation improvement programs such as those relating to

---

[15] 74 PA. C.S. § 1514(a)(1).

[16] 74 PA. C.S. § 1514(e.1).

[17] 74 PA. C.S. §§ 1513, 1506(e)(1).

[18] 74 PA. C.S. §§ 1516, 1506(e)(3).

[19] 74 PA. C.S. §§ 2102, 1506(e)(6).

streetscapes, lighting, sidewalk enhancement, and pedestrian safety, as well as other projects that improve the connectivity or utilization of existing transportation assets.[20]

Both the PTTF and the MTF are funded from multiple sources and not solely from toll revenues.[21] For example, almost one-quarter of the fees collected for driver's licenses, learner's permits, certificates of title, vehicle security interests, certificates of inspection, and other driver and vehicle services is directed to the MTF, while the remainder is deposited in the PTTF.[22] The amount collected from these fees and deposited in the MTF each year is much greater than the amount spent on programs related to aviation, rail freight, passenger rail, ports and waterways, and bicycle and pedestrian facilities.[23]

---

[20] 74 PA. C.S. § 2101.

[21] 74 PA. C.S. § 1506(b), (c), (e); 75 PA. C.S. § 1904(b).

[22] 75 PA. C.S. § 1904(b)(3).

[23] 74 PA. C.S. § 2104(a)(1) (providing $36 million in grants annually from the MTF for these programs); 2018-19 GOVERNOR'S EXECUTIVE BUDGET [GOVERNOR'S BUDGET], at H49 (Feb. 6, 2018) (indicating that $74-$80 million is deposited in the MTF annually from driver and vehicle fees), *available at*

…Continued

Similarly, the amount of revenue from sources other than toll revenues that is deposited in the PTTF greatly exceeds the amount of revenue contributed to the PTTF from toll revenues transferred pursuant to Act 44/89.[24] Thus, while "programs of statewide significance" receive approximately $20 million each year from the PTC transfer under Act 44/89,[25] these programs are funded with more than $60 million of revenue annually from the state sales tax.[26]

---

*Continued from previous page*
http://www.budget.pa.gov/PublicationsAndReports/Commonwealth Budget/Pages/default.aspx.

This Court may consider "matters of public record" when deciding a motion to dismiss. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). This includes administrative agency filings, "materials like decision letters of government agencies and published reports of administrative bodies," and other "records of a government agency." *Id.* at 249-50.

[24] *See* GOVERNOR'S BUDGET, at H67 (indicating that more than $700 million is deposited in the PTTF annually from sources other than the Act 44/89 transfer from the PTC).

[25] 74 PA. C.S. § 1506(e)(1)(i), (2)(ii), (3)(ii) (providing that 5% of the Act 44/89 funds deposited in the PTTF after transfer of $25 million to mass transit operating programs is directed to programs of statewide significance).

[26] 74 PA. C.S. § 1506(c)(1), (e)(3)(i) (providing that 13.24% of sales tax revenues deposited in the PTTF are allocated to programs of statewide significance); GOVERNOR'S BUDGET, at H67 (indicating that more than $465

*…Continued*

## STATEMENT OF QUESTIONS INVOLVED

1.  (a) State laws affecting interstate commerce that are enacted pursuant to express congressional authority do not violate the Dormant Commerce Clause. State laws that do not discriminate against or burden interstate commerce similarly do not violate the Dormant Commerce Clause. Where Act 44/89 requires the PTC to transfer funds to PennDOT for use in Commonwealth transportation projects that are authorized by a federal statute and that place no burden on interstate commerce, should plaintiffs' Dormant Commerce Clause claim be dismissed?

(b) Only state laws that have the purpose or effect of deterring interstate travel or that discriminate against particular classes of travelers violate the right to travel under the United States Constitution. Where Act 44/89 enhances transportation projects, particularly public transit projects, throughout the Commonwealth, and does not single out for unfavorable

---

*Continued from previous page*
million annually is deposited in the PTTF from sales tax receipts); *see also id.* at E39-13 (indicating that programs of statewide significance receive at least $80 million in funding annually).

treatment any class of travelers, should plaintiffs' right-to-travel claim be dismissed?

2.   Claims for damages against state executive-branch officials such as governors and cabinet secretaries in their official capacities are really claims against the state and are barred by the Eleventh Amendment to the United States Constitution. Claims for damages against such executive-branch officials in their individual capacities, based on their role in carrying out duly-enacted state laws, are barred by qualified immunity. To the extent plaintiffs assert any claims for damages against Governor Wolf or Secretary Richards in her individual capacity or her role as PennDOT Secretary, should those claims be dismissed?

3.   Executive-branch officials may be sued in their individual capacities for violating the United States Constitution if they misuse or abuse their positions while carrying out discretionary acts. Where plaintiffs have alleged only that Governor Wolf and Secretary Richards have carried out duly-enacted state laws, should any claims against them in their individual capacities be dismissed?

## ARGUMENT

At a minimum, the Court should dismiss any damages claims that plaintiffs purport to bring against Governor Wolf or against Secretary Richards in her individual capacity or her official capacity as PennDOT Secretary, as such claims are foreclosed by Eleventh Amendment or qualified immunity. Similarly, no claims can be brought against Governor Wolf or Secretary Richards in their individual capacities on the basis of the only allegations against them in the complaint—that they carried out their jobs by executing duly-enacted state laws.

This leaves only plaintiffs' claim for prospective relief against Governor Wolf and Secretary Richards, *i.e.*, a request for a permanent injunction precluding them from carrying out Act 44/89 on the ground that the law violates the Dormant Commerce Clause and the constitutional right to travel. These claims fail because Act 44/89 does not violate the United States Constitution.

## I. Plaintiffs' claims should be dismissed because they fail to state a claim that Act 44/89 violates the Dormant Commerce Clause or a right to travel.

Act 44/89 does not violate either the Dormant Commerce Clause or the constitutional right to travel because the statute and its implementation are

authorized by a federal statute, neither discriminate against nor burden

interstate commerce, and have neither the purpose nor the effect of

restricting interstate travel.

### A. Act 44/89 does not violate the Dormant Commerce Clause because Congress has specifically authorized state transportation authorities to use toll revenues for any purposes for which federal transportation funds may be used.

Congress can authorize states to engage in conduct that otherwise

would violate the Dormant Commerce Clause. As the Third Circuit has

explained, when "Congress so chooses, state actions which it plainly

authorizes are invulnerable to constitutional attack since Congress's

commerce power in such instances is not dormant, but has been exercised

by that body."[27] That is the case here.

In the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA),

Congress authorized public transportation authorities with jurisdiction

over toll facilities to use toll revenue from those facilities first for debt

service on bonds and on operation and maintenance of the toll facilities,

---

[27] *Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 873 (3d Cir. 2012) (internal quotation and citation omitted).

but then, to the extent additional funds are available, for "any other purpose for which Federal funds may be obligated by a State" under Title 23 of the U.S. Code.[28] Thus, so long as the funds transferred from the PTC to PennDOT pursuant to Act 44/89 are used for purposes for which federal funds may be used under Title 23, Act 44/89 is "invulnerable to constitutional attack."[29]

Congress amended ISTEA in 2015 through enactment of the Fixing America's Surface Transportation Act (FAST Act).[30] Section 1109(b) of the FAST Act, codified at 23 U.S.C. § 133(b), provides that states may use federal funds for a number of transportation programs in fourteen broad categories.[31] These include everything from highway and bridge construction to public transit capital projects to creation of natural gas refueling stations to recreational trail, pedestrian, and bicycle projects.[32]

---

[28] 23 U.S.C. § 129(a)(3)(A).

[29] *Mabey Bridge & Shore*, 666 F.3d at 873.

[30] Pub. L. No. 114-94, 129 Stat. 1311 (2015).

[31] *Id.* § 1109(b), 129 Stat. at 1338-40 (codified at 23 U.S.C. § 133(b)).

[32] 23 U.S.C. § 133(b); *see also* 23 U.S.C. §§ 137, 146, 206, 217; 49 U.S.C. § 5302(3).

The fourteen categories of projects for which excess highway toll revenues may be used are extensive, but not exhaustive. The FAST Act includes a catch-all clause that further authorizes use of toll revenues for "[a]ny type of project eligible under this section as in effect on the day before the date of enactment of the FAST Act, including projects described under section 101(a)(29) as in effect on such day."[33] Pre-FAST Act, § 101(a)(29) described numerous "transportation alternatives," including such items as "construction, planning, and design of on-road and off-road trail facilities for pedestrians, bicyclists, and other nonmotorized forms of transportation," "conversion and use of abandoned railroad corridors for trails for pedestrians, bicyclists, or other nonmotorized transportation users," "community improvement activities," such as "historic preservation and rehabilitation of historic transportation facilities," and "any environmental mitigation activity."[34]

In short, pursuant to express congressional authorization, Turnpike toll revenues may be used for: (1) any of the fourteen categories of projects

---

[33] 23 U.S.C. § 133(b)(15).

[34] 23 U.S.C. § 101(a)(29) (2014).

described in 23 U.S.C. § 133(b); (2) any of the categories of projects

described in the pre-FAST Act § 133(b); and (3) any of the broad categories

of transportation alternatives set forth in the pre-FAST Act § 101(a)(29).

In their complaint, plaintiffs do not contend that any of the funds

transferred from the PTC to PennDOT are used for projects *not* eligible for

federal funding under Title 23. Instead, they hinge their Dormant

Commerce Clause argument on the narrower proposition that some

projects funded with Turnpike tolls "have no functional relationship to the

Pennsylvania Turnpike."[35] Given the express congressional authorization

in § 129(a)(3)(A), this is not a proper basis on which to find Act 44/89

unconstitutional and is a sufficient basis alone to dismiss plaintiffs'

Dormant Commerce Clause claim for failure to state a claim.[36]

Moreover, the projects plaintiffs contend should not be funded with

Turnpike toll revenue include construction or repair of transportation

---

[35] Pl. Compl. ¶ 84.

[36] *See Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*, 462 F.3d 249, 272 (3d Cir. 2006) (noting that plaintiff had the burden of proving that a state law that did not discriminate against interstate commerce nonetheless violated the Dormant Commerce Clause).

14

facilities, underpasses, bridges, bus storage facilities, sidewalks, corporate park roads, state park roadways, curb ramps, multi-use trails, and bicycle and pedestrian safety structures.[37] These are all projects that fit easily within the broad authorization of the ISTEA, as amended by the FAST Act.

The only examples cited by plaintiffs that possibly are not covered by § 133(b) are airport terminal improvements and construction of a train track in an industrial park.[38] But plaintiffs do not allege (and could not allege) that these projects were paid for with funds transferred from the PTC to PennDOT. Rather, they only allege that these projects can receive funds from the MTF.[39] Yet the MTF receives not only $30 million annually from the PTC transfer to PennDOT,[40] but substantially more funds from various categories of vehicle and driver fees.[41] These fees currently contribute approximately $74-$80 million annually to the MTF.[42] Thus,

---

[37] Pl. Compl. ¶ 84.

[38] Pl. Compl. ¶ 84(k), (o).

[39] Pl. Compl. ¶ 79; *see also* 74 PA. C.S. § 2104.

[40] *See* 74 PA. C.S. § 1506(e)(6).

[41] *See* 75 PA. C.S. § 1904(b)(3).

[42] *See* GOVERNOR'S BUDGET, at H49; *see also supra* note 23.

plaintiffs not only have not alleged, but could not allege (let alone prove), that the funds transferred from the PTC to PennDOT were used to pay for airport or rail improvements through the MTF.[43]

Similarly, while plaintiffs appear to challenge the use of Act 44/89 funds to pay for such programs of statewide significance as intercity passenger rail and bus services,[44] even if such programs are not authorized to receive funding under Title 23, these programs receive more than three times as much funding from the state sales tax than from the PTC's transfer under Act 44/89.[45] Thus, again, not only have plaintiffs failed to plead that toll revenues are being used for programs allegedly not authorized by § 133(b), but they could not plausibly do so, given that the funds for such programs cannot be traced to toll revenues.

Just recently, another federal court held that the ISTEA foreclosed a challenge to the use of toll revenues for transportation projects unrelated to

---

[43] *Cf. Carroll v. Blinken*, 957 F.2d 991, 1002 (2d Cir. 1992) (finding no constitutional violation so long as funds received by student group from required fees was less than the amount it spent on permissible purposes).

[44] Pl. Compl. ¶ 83.

[45] *See supra* notes 25-26 & accompanying text.

the toll facility that generated those revenues.[46] In that case, various transportation associations and companies challenged the New York State Thruway Authority's use of surplus highway toll revenue to fund the state's canal system, contending that such use violated the Dormant Commerce Clause.[47] The district court rejected this argument, and the Second Circuit affirmed, on the ground that Congress had expressly authorized such use in the ISTEA.[48]

The same is true here. Because Congress has expressly authorized the precise use of Turnpike tolls that plaintiffs allege constitutes the basis for the purported constitutional flaw in Act 44/89, plaintiffs have failed to state a claim under the Dormant Commerce Clause upon which relief could be granted.

---

[46] *American Trucking Ass'ns, Inc. v. New York State Thruway Auth.*, 886 F.3d 238, 241 (2d Cir. 2018).

[47] *Id.*

[48] *Id.*

**B. Act 44/89 also does not violate the Dormant Commerce Clause because the statute does not discriminate against or burden interstate commerce.**

Even if Congress had not expressly authorized the use of Turnpike toll revenue that plaintiffs challenge, plaintiffs' Dormant Commerce Clause claim would fail. Nothing about the use of toll revenues under Act 44/89 contravenes the Dormant Commerce Clause.

The Commerce Clause prohibits a state from enacting a law that discriminates against and burdens interstate commerce. As the Third Circuit has explained, "the commerce clause is concerned with protectionism and the need for uniformity, and case law demonstrates that legislation will not be invalidated under the *Pike*[49] test unless it imposes *discriminatory* burdens on interstate commerce."[50]

Plaintiffs do not contend that the Turnpike tolls discriminate against interstate commerce.[51] Thus, the fundamental question under the Dormant

---

[49] *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

[50] *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 826 (3d Cir. 1994) (internal quotation and alterations omitted; emphasis in original).

[51] *See* ECF No. 20 at 20.

Commerce Clause is "whether the [state statute] imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'"[52] Plaintiffs make the conclusory allegation that it is a burden on interstate commerce when Turnpike tolls are used in part for other transportation projects.[53] But even aside from Congress's express authorization of the use of Turnpike tolls on other Commonwealth transportation projects, none of the facts alleged in plaintiffs' complaint support the conclusion that using Turnpike tolls for other Commonwealth transportation projects burdens interstate commerce.

Rather than point to facts supporting their claim that Turnpike tolls actually burden interstate travel, plaintiffs rely on Supreme Court jurisprudence involving user fees.[54] Even assuming that this jurisprudence rather than the well-established and frequently-applied *Pike* test applies here, plaintiffs' reliance on user-fee case law fails to support their contention that the tolls violate the Dormant Commerce Clause.

---

[52] *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994) (quoting *Pike*, 397 U.S. at 142).

[53] *See, e.g.*, Pl. Compl. ¶ 97.

[54] Pl. Compl. ¶¶ 121-122.

Plaintiffs invoke the Supreme Court's holding in *Northwest Airlines, Inc. v. County of Kent*, that "a levy is reasonable . . . if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce."[55] But plaintiffs' focus, directed as it is solely on Turnpike operations, is improperly narrow.

In fact, the Turnpike is part of the larger transportation system in Pennsylvania. Those who pay tolls to use the Turnpike benefit from not only access to the Turnpike itself but from the maintenance, operation, and improvement of the entire transportation system, of which the Turnpike is one part. When the Commonwealth imposes a fee for use of its highways in proportion to the mileage traveled on those Commonwealth highways, there is no Dormant Commerce Clause concern because those tolls are "simply payments for traveling a certain distance that happens to be within Pennsylvania."[56] The fact that the fee imposed does not match the precise

---

[55] 510 U.S. 355, 369 (1994) (quoting *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716-17 (1972)).

[56] *American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 283 (1987).

cost of maintaining the portion of state highways traveled by the fee payer does not alter this conclusion.

Indeed, the Supreme Court frequently has rejected the argument "that the proceeds of all taxes levied for the privilege of using the highways must be allocated directly and exclusively to maintaining them."[57] The Court has noted that it has not held "that all state exactions for the privilege of using the state's highways are valid only if their proceeds are required to go directly and exclusively for highway maintenance, policing and administration."[58] The Court has thus upheld fees imposed for the privilege of using a state's highways, even when those fees do not "reflect

---

[57] *Aero Mayflower Transit Co. v. Board of Railroad Comm'rs*, 332 U.S. 495, 504 (1947); *see also Morf v. Bingaman*, 298 U.S. 407, 412 (1936) ("where the manner of the levy . . . definitely identifies it as a fee charged for the grant of the privilege, it is immaterial whether the state places the fees collected in the pocket out of which it pays highway maintenance charges or in some other"); *Clark v. Poor*, 274 U.S. 554, 557 (1927) ("Since the tax is assessed for a proper purpose and is not objectionable in amount, the use to which the proceeds are put is not a matter which concerns the plaintiffs.").

[58] *Aero*, 332 U.S. at 504. The Supreme Court has overruled the specific holding of *Aero* that states may impose flat taxes for the privilege of using their highways, even if such taxes have a clearly discriminatory effect on interstate commerce, *see, e.g.*, *American Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 179-80 (1990) (plurality), but it has not disclaimed the broader principles invoked in that case, *id.* at 181.

with exact precision every gradation in use" of those highways.[59] Yet this rejected test is the one plaintiffs seek to impose: according to plaintiffs, any state levy for the use of its highways, even a nondiscriminatory one, must closely match the costs imposed or benefits enjoyed by the user/tollpayer.

Plaintiffs' narrow focus on the costs and benefits of the Turnpike, rather than all the state's transportation facilities, is unsupported by the case law. Tolls levied on users of one of Pennsylvania's primary highways are used exclusively for Pennsylvania transportation facilities, including that highway. Plaintiffs do not allege in their complaint that the tolls paid by Turnpike travelers are excessive in relation to the benefits they receive from having access to an extensive and well-maintained *Commonwealth transportation system*. They simply assume that the fees must be excessive in relation to the benefit because those fees, when totaled, allegedly exceed the cost of operating and maintaining *the Turnpike*. But the fact that plaintiffs (or other putative class members) might not use other state

---

[59] *Aero*, 332 U.S. at 506 & n.19.

transportation facilities funded with Turnpike toll revenues does not render the tolls they pay unconstitutionally excessive.[60]

In short, plaintiffs' attempt to limit the use of Turnpike tolls to operation and maintenance of the Turnpike, rather than for all Pennsylvania transportation facilities, is unsupported by the law or the facts. Under plaintiffs' theory, a motorist traveling from Harrisburg to Pittsburgh would have a claim under the Dormant Commerce Clause if the revenue from the Turnpike toll she paid was more than was needed to operate and maintain that portion of the Turnpike and the excess funds were used to maintain the separate portion of the Turnpike between Plymouth Meeting and Allentown. Nothing in the applicable Dormant Commerce Clause jurisprudence supports this reading of the Constitution.

---

[60] *Cf. Evansville-Vanderburgh*, 405 U.S. at 717-20 (upholding flat airline-passenger fee used to pay for airport construction and maintenance, even though it exempted numerous classes of passengers, as well as other airport users, because the charge was "a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed").

**C. Act 44/89 does not violate plaintiffs' right to travel because it does not have the purpose or effect of deterring travel nor discriminate against any class of travelers.**

Plaintiffs rely on another conclusory allegation—that Turnpike tolls that allegedly add up to more than the amount needed to operate the Turnpike limit and unduly burden travelers' access to the Turnpike—to support their second claim, based on the constitutional right to travel.[61] But they offer no explanation of how Turnpike tolls allegedly set at a level higher than necessary to fund Turnpike operations actually limit or burden plaintiffs' right to travel in or through Pennsylvania. Thus, this claim too should be dismissed for failure to state a claim upon which relief can be granted.

The Supreme Court has noted that the constitutional right to travel "embraces at least three different components," only one of which—"the right of a citizen of one State to enter and to leave another State"—could possibly be implicated here.[62] This right to travel from one state to another

---

[61] Pl. Compl. ¶ 128.

[62] *Saenz v. Roe*, 526 U.S. 489, 500 (1999). The other two components are "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Id.*

includes the right "to use the highways and other instrumentalities of interstate commerce in doing so."[63] But every fee imposed on the use of such highways or other instrumentalities of interstate commerce does not violate the constitutional right to travel. Rather, a "state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right."[64]

Plaintiffs do not contend, and could not plausibly contend, that the goal of Act 44/89 is to deter travel; such a contention would be absurd. Nor do they claim that Turnpike tolls penalize particular categories of interstate travelers. This leaves only the possibility that Act 44/89, by allegedly requiring Turnpike tolls above the level necessary to fund Turnpike operations, actually deters interstate travel.

As noted above, plaintiffs' only contention in this regard is the conclusory one that the level of Turnpike tolls discourages travelers from

---

[63] *United States v. Guest*, 383 U.S. 745, 757 (1966).

[64] *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality) (internal quotations and citations omitted).

using the Turnpike.[65] But such a conclusory allegation, without any supporting factual contentions, is insufficient to survive a motion to dismiss.[66] Moreover, the Supreme Court has rejected the notion that a state-imposed fee on the use of interstate travel facilities impermissibly burdens the constitutional right to travel.[67]

Finally, even if the level of Turnpike tolls did somehow deter travelers from using *the Turnpike*, this would not mean that the tolls (or Act 44/89) actually deter *interstate travel* in or through Pennsylvania. The right to interstate travel does not mean a traveler has a constitutional right to the most convenient form of travel.[68] "[B]urdens on a single mode of

---

[65] Pl. Compl. ¶ 128.

[66] *See, e.g.*, *Finkelman v. NFL*, 810 F.3d 187, 194 (3d Cir. 2016) ("we are mindful of the Supreme Court's teaching that all aspects of a complaint must rest on 'well-pleaded factual allegations' and not 'mere conclusory statements'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009))).

[67] *Evansville-Vanderburgh*, 405 U.S. at 711-14; *see also Wallach v. Brezenoff*, 930 F.2d 1070, 1072 (3d Cir. 1991); *Weisshaus v. Port Auth. of N.Y. & N.J.*, No. 11-Civ.-6616, 2011 U.S. Dist. LEXIS 158650, at *4 (S.D.N.Y. Oct 24, 2011) ("Non-discriminatory state-created burdens placed on travel—such as gasoline taxes, licensing requirements and tolls—do not constitute a violation of the right to travel, as they place only a negligible burden on commerce."), *aff'd in relevant part*, 497 F. App'x 102 (2d Cir. 2012).

[68] *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007).

transportation do not implicate the right to interstate travel."[69] Given the numerous readily available alternative routes and modes of transportation that do not require plaintiffs to pay the allegedly excessive Turnpike tolls, they cannot show that they have actually been deterred from traveling interstate by the level of Turnpike tolls.

* * * *

Plaintiffs' complaint fails to state a claim upon which relief can be granted and should be dismissed in its entirety.

## II. To the extent that plaintiffs seek damages from Governor Wolf or Secretary Richards in either their official or individual capacities, such claims should be dismissed because they are barred by Eleventh Amendment and qualified immunity.

Barring waiver of immunity, state officials are immune from suits for damages in their official capacities under the Eleventh Amendment and are immune from suits for damages in their individual capacities for simply executing duly-enacted state laws, which is all Governor Wolf and

---

[69] *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999); *cf. Lutz v. City of York*, 899 F.2d 255, 270 (3d Cir. 1990) (holding that governments may impose reasonable restrictions on the right to intrastate travel if those restrictions are narrowly tailored to meet significant objectives).

Secretary Richards are alleged to have done with regard to Act 44/89.

Plaintiffs do not appear to seek damages from Governor Wolf or from

Secretary Richards in any capacity other than her role as PTC chairperson.[70]

Yet they have sued Governor Wolf and Secretary Richards in their

individual capacities, in which they would be subject only to a damages

claim and not a claim for injunctive relief. Thus, in an abundance of

caution, Governor Wolf and Secretary Richards move to dismiss any

damages claims against them, in the event the Court does not dismiss the

entire complaint.

### A. Damages claims against a state's executive-branch officials such as a governor or cabinet secretary sued in their official capacities are barred by the Eleventh Amendment.

It is well-established that the United States Constitution does not permit

federal courts to exercise jurisdiction over suits against unconsenting

---

[70] *See, e.g.*, Pl. Compl. ¶ 33 ("Damages awarded to the Plaintiffs and the putative class that Plaintiffs seek to represent will be payable by PTC, not by the Commonwealth of Pennsylvania."); ¶ 125 ("Plaintiffs and class members have suffered and continue to suffer damages as a result of Defendants' imposition of the unconstitutional toll."); ¶ 130 (same); Wherefore Cl. ¶ 10 (seeking judgment for refund of allegedly excessive tolls from "PTC, its Commissioners, and its Executive Officers").

states.[71] This prohibition, grounded in the Eleventh Amendment to the Constitution, extends to damages claims against state executive-branch officials sued in their official capacities.[72] As the Third Circuit has explained, "an action in federal court for damages or back pay against a state official acting in his official capacity is barred because such retrospective relief necessarily depletes the state treasury."[73] Thus, to the extent plaintiffs seek damages from Governor Wolf or Secretary Richards in their official capacities, such a claim is barred by the Eleventh Amendment and should be dismissed.

---

[71] *See, e.g.*, *Sossamon v. Texas*, 563 U.S. 277, 284 (2011). There is no doubt that Pennsylvania has not waived its immunity from a damages suit in the present context. *See* 1 PA. C.S. § 2310; 42 PA. C.S. §§ 8521-8522.

[72] *See, e.g.*, *Laskaris v. Thornburgh*, 661 F.2d 23, 25-26 (3d Cir. 1981); *Cook v. Floyd*, 398 F. App'x 702, 703 (3d Cir. 2010) ("State officials acting in their official capacities have the same Eleventh Amendment immunity from damage suits as the state itself."); *Scott v. Beard*, 252 F. App'x 491, 492-93 (3d Cir. 2007) (holding that, because a claim against department secretary in his official capacity "is essentially leveled against Pennsylvania itself, it is barred by the Eleventh Amendment").

[73] *Laskaris*, 661 F.2d at 25-26.

**B. Executive-branch officials sued in their individual capacities are immune from damages claims based on their carrying out of duly-enacted laws.**

Plaintiffs also purport to sue Governor Wolf and Secretary Richards in their "individual" capacities.[74] While the Eleventh Amendment does not shield state officials from damages claims brought against them in their individual capacities, they enjoy qualified immunity from such claims when they act "reasonably in good-faith fulfillment of their responsibilities."[75]

Here, plaintiffs allege only that Governor Wolf and Secretary Richards "are responsible for faithfully executing the laws of the Commonwealth."[76]

---

[74] Courts often refer to suits seeking to impose personal liability on state officials as brought against them in their "personal capacity," and that is presumably what plaintiffs intend in suing Governor Wolf and Secretary Richards in their "individual capacity." *See, e.g., Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850, 856 (3d Cir. 2014) (holding that state official could be sued under § 1983 because he was sued "in his personal capacity"); *see also Hafer v. Melo*, 502 U.S. 21, 29-31 (1991) (rejecting argument that "the Eleventh Amendment forbids *personal-capacity suits* against state officials in federal court," and holding that the Eleventh Amendment does not bar suits against state officials "sued in their *individual capacities*" (emphases added)).

[75] *Gruenke v. Seip*, 225 F.3d 290, 301 (3d Cir. 2000) (quoting *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985)).

[76] Pl. Compl. ¶ 66.

Nowhere in their complaint do plaintiffs allege that Governor Wolf or

Secretary Richards are doing anything other than reasonably and in good

faith fulfilling their responsibilities as governor and cabinet secretary.[77]

Thus, they are entitled to qualified immunity and cannot be liable for

damages in their individual or personal capacities.[78]

---

[77] State actors exercising discretion in carrying out their duties are shielded from damages claims by qualified immunity if their conduct did not violate clearly established constitutional rights. *See, e.g.*, *Williams v. Secretary Pa. Dep't of Corr.*, 848 F.3d 549, 557 (3d Cir.), *cert. denied*, 138 S. Ct. 357 (2017). While plaintiffs do not allege that Governor Wolf or Secretary Richards were performing discretionary functions, even if they were, they would be entitled to qualified immunity, as it is far from clearly established that Act 44/89 is unconstitutional. Indeed, in arguing that the law violates the constitution, plaintiffs pointed to neither binding authority nor decisions by any courts of appeals in which highway tolls were found to be unconstitutional because they exceeded the cost of operating and maintaining the roads for which access required payment of the tolls. *See, e.g.*, ECF No. 20 at 20-25.

[78] *Cf. Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 441 (6th Cir. 2016) ("Because [the cabinet secretary] acted in the face of legislative action (a duly enacted, presumptively constitutional law) and judicial inaction (the absence of an on-point decision making the law unconstitutional), he did not violate clearly established law or otherwise act unreasonably.").

III. **Plaintiffs' claims against Governor Wolf and Secretary Richards in their individual capacities should be dismissed for failure to state a claim on which relief can be granted because the complaint does not allege that either of them misused or abused their positions while carrying out discretionary acts.**

As noted above, the only allegation against Governor Wolf and Secretary Richards is that they carried out their non-discretionary job responsibilities of executing duly-enacted state laws. This is not a proper basis to sue them in their individual or personal capacities and the purported claims against them in this capacity should be dismissed.

A. **Executive-branch officials may be liable for damages in their individual capacities only when they misuse or abuse their official positions.**

State officials who are alleged to have done nothing more than faithfully carry out their jobs of executing duly-enacted state laws cannot be sued in their individual capacities. Rather, individual or personal liability (as opposed to official liability) can arise only when a state actor abuses his position or misuses his state authority.[79]

---

[79] *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 242-43 (1974).

Moreover, state officials cannot be held liable in their individual capacities unless they were personally involved in alleged wrongdoing.[80] Plaintiffs do not allege that Governor Wolf or Secretary Richards had any personal involvement in enactment of the allegedly unconstitutional law plaintiffs target in this lawsuit. Nor do they allege that Governor Wolf or Secretary Richards have any personal involvement in setting the level of Turnpike tolls, issuing bonds, or determining how money transferred from the PTC to PennDOT is spent. Rather, plaintiffs contend that all of these decisions are governed by Act 44/89.[81] And to the extent that Governor Wolf or Secretary Richards have *any* role in carrying out Act 44/89, it is not alleged to be a personal, discretionary one.

Thus, plaintiffs fail to state a claim against Governor Wolf or Secretary Richards in their individual capacities.

---

[80] *Thomas v. Independence Twp.*, 463 F.3d 285, 298 (3d Cir. 2006); *Walker v. Beard*, 244 F. App'x 439, 440-41 (3d Cir. 2007).

[81] *See, e.g.*, Pl. Compl. ¶¶ 51-54, 59-61, 63-65, 71, 77-83.

**B. Executive-branch officials cannot be sued in their individual capacities for prospective relief seeking to enjoin them from carrying out their official duties.**

Finally, the injunctive relief plaintiffs seek against Governor Wolf and Secretary Richards—an order preventing them from enforcing Act 44/89 or spending any funds pursuant to that law[82]—even if warranted (and, as discussed above in Section I, it is not), may be sought against them only in their official capacity.[83] For this reason as well, all claims plaintiffs assert against Governor Wolf and Secretary Richards in their individual or personal capacities should be dismissed.

---

[82] Pl. Compl., Wherefore Cl. ¶¶ 5, 9.

[83] *Iles v. de Jongh*, 638 F.3d 169, 177-78 (3d Cir. 2011) (noting that state officials may be sued in their official capacity for prospective injunctive relief); *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 314 n.2 (3d Cir. 2002) (same).

## CONCLUSION

Plaintiffs' complaint should be dismissed.

/s/ Bruce P. Merenstein
Bruce P. Merenstein (Bar ID No. PA 82609)
    (application for admission forthcoming)
Arleigh P. Helfer III (Bar ID No. PA 84427)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 751-2249
Fax: (215) 751-2205
bmerenstein@schnader.com
ahelfer@schnader.com

Dated: May 15, 2018

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(B)**

I, Bruce P. Merenstein, hereby certify that this Brief complies with the

word-count limit of Local Rule 7.8(b), as modified by this Court's May 8,

2018 Order (ECF No. 45), because the Brief contains 6,557 words, as

determined by the word-count feature of the word-processing system used

to prepare the Brief.


/s/ Bruce P. Merenstein
Bruce P. Merenstein

## CERTIFICATE OF SERVICE

I, Bruce P. Merenstein, hereby certify that this 15th day of May 2018, I caused the foregoing Memorandum of Law in Support of Motion to Dismiss to be filed and served on all counsel of record via the Court's ECF system, where it is available for viewing and downloading.


/s/ Bruce P. Merenstein
Bruce P. Merenstein