**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **OWNER OPERATOR** | : | |
| **INDEPENDENT DRIVERS** | : | |
| **ASSOCIATION, INC., <u>et al.</u>,** | : | **No. 1:18-cv-00608** |
| **Plaintiffs** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| | : | |
| **PENNSYLVANIA TURNPIKE** | : | |
| **COMMISSION, <u>et al.</u>,** | : | |
| **Defendants** | : | |

<u>**MEMORANDUM**</u>

In this action members of the motoring public who routinely access the Pennsylvania

Turnpike (the "Turnpike") for business and personal travel have joined together in challenging

Turnpike tolls that are alleged to be increasingly disproportionate to services rendered.  Plaintiffs

allege that the Pennsylvania statutory scheme permitting this inequity ("Act 44/89"), first

enacted in 2007, violates the dormant Commerce Clause of the United States Constitution and

their constitutional right to travel.  Specifically, Plaintiffs complain that in violation of the

Constitution, Act 44/89 authorizes and directs the Pennsylvania Turnpike Commission ("PTC")

to collect user fees with no regard to Turnpike operating costs and to redistribute those funds to

the Pennsylvania Department of Transportation ("PennDOT") for projects across the

Commonwealth that are of no benefit to the paying Turnpike motorist.

Plaintiffs in this case are: Owner Operator Independent Drivers Association, Inc.

("OOIDA"), National Motorists Association ("NMA"), Marion L. Spray ("Spray"), B.L. Reever

Transportation, LLC ("B.L. Reever"), Flat Rock Transportation, LLC ("Flat Rock"), Milligan

Trucking, Inc. ("Milligan Trucking"), Frank Scavo ("Scavo"), and Laurence G. Tarr ("Tarr"),

consisting of organizations, businesses, and individuals who are required to pay and have paid

tolls to the PTC for their use of the Turnpike (collectively, "Plaintiffs").  (Doc. No. 1 ¶¶ 9-18.)

Defendants are the PTC, William K. Lieberman, Vice Chair of the PTC, Barry T. Drew,

Secretary Treasurer of the PTC, Pasquale T. Deon, Sr., Commissioner of the PTC, John N.

Wozniak, Commissioner of the PTC, Mark P. Compton, Chief Executive Officer of the PTC,

Craig R. Shuey, Chief Operating Officer of the PTC (collectively, the "PTC Defendants"), Tom

Wolf, Governor of the Commonwealth of Pennsylvania, and Leslie S. Richards, Chair of the

PTC and Secretary of PennDOT (collectively, the "Commonwealth Defendants").  (Id. ¶¶ 19-

28.)

     Before the Court are four motions to dismiss Plaintiffs' complaint filed by the PTC

Defendants,[1] the Commonwealth Defendants, individual defendant Shuey, and individual

defendant Lieberman.  (Doc. Nos. 49, 50, 52, and 53.)  Also before the Court is Plaintiffs'

Motion for Partial Summary Judgment on the issue of liability.  (Doc. No. 84.)  The motions

have been fully briefed and are ripe for disposition.[2]  For the reasons that follow, the PTC and

Commonwealth Defendants' motions to dismiss will be granted, the motions filed by individual

defendants Shuey and Lieberman will be denied as moot, and Plaintiffs' motion for partial

summary judgment on the issue of liability will be denied.[3]

---

[1]  The PTC Defendants' motion is styled as a "Motion to Dismiss for Failure to State a Claim or, in the Alternative, Motion for Summary Judgment."  (Doc. No. 52.)

[2]  With the permission of the Court, the Pennsylvania Public Transportation Association, Southeastern Pennsylvania Transportation Authority, and Port Authority of Allegheny County filed a Brief Amicus Curiae in support of the Defendants' motions.  (Doc. Nos. 57-1, 63.)

[3]  Plaintiffs also filed a "Motion to Certify Class and Appoint Class Counsel" (Doc. No. 73), with supporting exhibits (Doc. No. 74), and brief (Doc. No. 75).  By Order dated June 25, 2018, the Court stayed all additional briefing on the motion until the Court's resolution of the pending dispositive motions.  (Doc. No. 83.)  In light of the Court's resolution of the pending dispositive motions, Plaintiffs' "Motion to Certify Class and Appoint Class Counsel" will be denied as moot.

# I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[4]

## A.  Act 44/89

The Turnpike is a toll road operated by the PTC, running for 359 miles across the Commonwealth, beginning at the Ohio state line in Lawrence County and ending at the New Jersey border at the Delaware River Bridge in Bucks County.  (Doc. No. 1 ¶ 41.)  Including the Northeastern Extension and Western Extension, the Turnpike covers 552 miles.  (Id.)  Plaintiffs challenge the constitutionality of "excessive" tolls charged to named Plaintiffs and members of a putative class of motor carriers, drivers, and motorists by the PTC for travel on the Turnpike. (Doc. No. 1 ¶ 1.)  The PTC is "an instrumentality of the Commonwealth."  36 P.S. § 652d; Doc. No. 1 ¶ 32.  Pennsylvania law authorizes the PTC to fix and adjust tolls to generate funds for services and facilities provided by the Commonwealth of Pennsylvania, as follows:

(a) Establishment and changes in toll amounts. --

. . .

> Tolls shall be fixed and adjusted as to provide funds at least sufficient with other Revenues of the Pennsylvania Turnpike System, if any, to pay all of the following:
> . . .
>
> (3) Amounts due to the department under 75 Pa. C.S. Ch. 89 (relating to Pennsylvania Turnpike) and pursuant to the lease agreement under 75 Pa. C.S. § 8915.3 (relating to lease of Interstate 80; related agreements).
> . . .
>
> (5) Any other amounts payable to the Commonwealth or to the department.

74 Pa. C.S. § 8116(a); Doc. No. 1 ¶ 40.  Plaintiffs' complaint alleges that the PTC obtains almost the entirety of its operating revenue from tolls.  (Doc. No. 1 ¶ 86.)  Plaintiffs allege that prior to the enactment of Act 44, the PTC raised tolls on the Turnpike only five times in the 64-year

---

[4]  The following factual background is taken from the allegations of Plaintiffs' complaint (Doc. No. 1), as well as provisions of the relevant statutes.

history of the Turnpike.  (Id. ¶ 87.)  Plaintiffs allege that in fiscal year ending May 31, 2015, 192

million vehicles traveled on the Turnpike, consisting of approximately 166 million Class 1

Passenger vehicles and 26 million Class 2-9 commercial vehicles.  (Id. ¶ 42.)  Plaintiffs'

complaint estimates that trucks provide for about half of the annual toll revenues generated by

the Turnpike, producing $443 million in toll revenues for PTC in the 2016 fiscal year.  (Id. ¶ 43.)

In 2007, the Pennsylvania General Assembly enacted a statute known as Act 44,

amending portions of the Pennsylvania Public Transportation Law (Title 74) and the Vehicle

Code (Title 75).  See Act of July 18, 2007, P.L. 169, No. 44; Doc. No. 1 ¶ 44.  Pursuant to the

statute, the PTC and PennDOT entered into a Lease and Funding Agreement ("LAFA"), for a

term of fifty years.  See 75 Pa. C.S. § 8915.3(1); Doc. No. 1 ¶ 45.  Act 44, as originally enacted,

required the PTC to make a "[s]cheduled annual commission contribution" to PennDOT in the

following amounts:

## TABLE 1

| Amount | Fiscal Year |
|---|---|
| $750,000,000 | 2007-2008 |
| $850,000,000 | 2008-2009 |
| $900,000,000 | 2009-2010 |
| Annual Increases of 2.5% | 2010-End |

75 Pa. C.S. § 8901; Doc. No. 1 ¶ 52.  As alleged in Plaintiffs' complaint, on December 4, 2008,

the PTC issued a press release regarding an imminent 25 percent toll increase:

> In December 2008, PTC's CEO announced:  "The mission of [the Turnpike] has
> changed. . . . For the first time, toll income isn't only going back into our toll
> roads, but helping to fund infrastructure improvements in every corner of
> Pennsylvania . . . . Toll increase proceeds are mainly earmarked for non-Turnpike

projects, so the funds generated by this [2009 toll] increase will largely be used by PennDOT to help finance off-Turnpike road and bridge projects and the state's 74 mass-transit operations."

(Doc. No. 1 ¶ 72.)  In a December 30, 2008 press release by the PTC, the PTC's CEO stated that "[i]n fact, more than 90 percent of the toll-increase proceeds will benefit non-Turnpike road and bridge projects and transit operations."  (Id. ¶ 73.)

In 2013, the General Assembly again amended the Public Transportation Law and Vehicle Code through legislation known as Act 89.  See Act of Nov. 25, 2013, P.L. 974, No. 89; Doc. No. 1 ¶ 46.  Act 89 amended the PTC's annual payment obligations to PennDOT.  (Doc. No. 1 ¶ 53.)  Pursuant to Act 89, the PTC and PennDOT amended the LAFA in 2014, entering into an Amended Funding Agreement scheduled to terminate in October of 2057.  (Doc. No. 1 ¶ 47.)

The statutory scheme established by Act 44/89 provides for annual payments made by the PTC to PennDOT that currently total $450 million annually through fiscal year 2022 and reduce to $50 million annually through 2057.  See 75 Pa. C.S. §§ 8901;  Doc. No. 1 ¶¶ 51-54.  Under Act 44/89, the PTC's annual payments to PennDOT through fiscal year 2057 will total $9.65 billion.  (Doc. No. 1 ¶ 55.)  The PTC obtains the funds necessary to make the annual Act 44/89 payments from Turnpike tolls and from bonds it issues, the interest and principal of which are paid from tolls.  (Id. ¶¶ 59-61.)  Plaintiffs' complaint alleges that the PTC's Act 44/89 payments to PennDOT, interest, and bond expenses are classified by the PTC as "non-operating expenses." (Id. ¶ 62.)  As alleged by Plaintiffs, the largest portion of PTC's revenues derive from tolls, which are pledged to secure the PTC's outstanding Senior Revenue Bonds, also known as Turnpike Revenue Bonds.  (Id. ¶ 63.)  Plaintiffs' complaint alleges that, according to the Commonwealth of Pennsylvania Auditor General's 2016 Performance Audit of PTC ("2016

Performance Audit"), beginning in 2015, the PTC's Act 44/89 payments have been solely

dedicated to "non-highway purposes," including transit.  (Id. ¶ 69.)  The PTC Act 44 Financial

Plan Fiscal Year 2018 ("Act 44 Plan FY2018"), dated June 1, 2017, describes the change in

funding obligations imposed by Act 89 as follows:

> Act 89 substantially altered the Commission's funding obligations to PennDOT.  While the Commission's aggregate payment obligation remains at $450 million annually, beginning July 1, 2014, none of the payments are dedicated to highways and bridges. Instead, all $450 million is allocated to support transit capital, operating, multi-modal and other non-highway programs.

(Doc. No. 1 ¶ 70) (quoting Act 44 Plan FY2018).

Pursuant to Act 44/89, PennDOT deposits the annual payments from the PTC into the

Public Transportation Trust Fund ("PTTF").  See 74 Pa. C.S. § 1506(b)(1).  Monies from that

fund are then distributed among four programs:  the "operating program," the "asset

improvement program," the Multimodal Transportation Fund ("MTF"), and "programs of

statewide significance."  See 74 Pa. C.S. §§ 1506(e)(1)-(3), (6); Doc. No. 1 ¶ 71.  The statute

directs that of the $450 million transferred to the PTTF, $30 million must be deposited in the

MTF.  74 Pa. C.S. § 1506(b)(1), (e)(6).  The statute further provides that 95% of the funds

transferred to the PTTF annually from PennDOT, after the transfer of $30 million to the MTF,

are utilized in connection with the "asset improvement program."  Id. §§ 1514, 1506(e)(2).

Funds expended in connection with the "asset improvement program" are used for

"improvement, replacement or expansion of capital projects" related to public transportation.  Id.

§ 1514(a)(1).  The relevant statute provides that southeastern Pennsylvania's public

transportation agency, ("SEPTA"), and the Port Authority of Allegheny County receive the

majority of such funds, with other mass transit agencies in the Commonwealth receiving the

remaining funds.  See id. § 1514(e.1).  The statute provides that as to the "asset improvement

program," "[e]ligible applicants . . . may apply for financial assistance for improvement,

replacement or expansion of capital projects."  Id. § 1514.  Such applicants may include "[a]

local transportation organization," Commonwealth agencies and instrumentalities, and any

"person responsible for coordinating community transportation program services."  Id. § 1514(a).

A "capital project" is defined as:

> A system or component of a system for the provision of public passenger
> transportation. The term includes vehicles; infrastructure power; passenger
> amenities; storage and maintenance buildings; parking facilities; the land on which
> any capital project is situated and the land needed to support it, whether owned in
> whole or in part; overhaul of vehicles; debt service; and the cost of issuance of
> bonds, notes and other evidences of indebtedness which a local transportation
> organization or transportation company is permitted to issue under any law of this
> Commonwealth.

Id. § 1503.  A significantly smaller amount of the funds transferred from the PTC to PennDOT

and deposited in the PTTF is dedicated to the "operating program"[5] and "programs of statewide

significance."[6]  Id. §§ 1513, 1516, 1506(e)(1), (3).

The $30 million deposited in the MTF finances transportation improvement programs

including those related to bicycle and pedestrian safety, aviation, rail freight, passenger rail, and

ports and waterways.  Id. § 2104(a).  "Eligible program[s]" under the MTF include:  "(1) A

project which coordinates local land use with transportation assets to enhance existing

communities[,]  (2) A project related to streetscape, lighting, sidewalk enhancement and

---

[5] The "operating program" funds "operating expenses," defined as including expenses "for any
purpose in furtherance of public passenger transportation, including all state asset maintenance
costs."  74 Pa. C.S. §§ 1513(a)(2), 1503.

[6] "Programs of statewide significance" encompass "public transportation programs, activities
and services not otherwise fully funded through the operating program, capital program or asset
improvement program," specifically including the persons with disabilities program, intercity
passenger rail and bus services, and community transportation capital and service stabilization,
among other items.  Id. § 1516(a)(1)-(8).

pedestrian safety[,]  (3) A project improving connectivity or utilization of existing transportation assets[, and]  (4) A project related to transit-oriented development[.]"  Id. § 2101.

Plaintiffs' complaint alleges that some of the projects approved under these statutory provisions (and funded with Act 44/89 toll revenues) include the following:

a.   Development of Three Crossings, a mixed-use development consisting of residential units, office space, and a transportation facility with vehicle and bicycle parking, bicycle repair, electric-vehicle charging stations, kayak storage, and transit station in Pittsburgh (Allegheny County);

b.   Construction of an underpass under U.S. 22, connecting the Lower Trail with Canoe Creek State Park (Blair County);

c.   Rehabilitation of nine stone-arch bridges along the SEPTA regional railway line (Regional project);

d.   Replacement of the roof at Collier Bus Garage (Allegheny County);

e.   Sidewalk installation along North Main Street in Yardley (Bucks County);

f.   Installation of approximately 1,800 feet of ADA-compliant sidewalk along the south side of Union Deposit Road between Shield Street and Powers Avenue at the Union Square Shopping Center in Susquehanna (Dauphin County);

g.   Extension of internal road, including final design, survey, permit modifications, bid documents, construction, storm water, street lights, project administration, legal expenses, audit expenses, and contingencies in Windy Ridge Business and Technology Park (Indiana County);

h.   Improvements to roadways in 12,000 acres of parks, including widening shoulders, paving, signage installation, and bicycle marking in the Allegheny County Parks;

i.   Addition of eight curb ramps, new asphalt, four decorative crosswalks and a surface sign at an intersection in Latrobe (Westmoreland County);

j.   Phase II Construction of Erie Metropolitan Transportation Authority's Maintenance and Paratransit Bus Storage Facility (Erie County);

k.   Improvements to the Erie International Airport terminal building (Erie County);

    l.   Creation of a multi-use trail and installing associated signage from the West End neighborhood linking existing bike routes to a multi-use path that connects to The Pennsylvania State University (Centre County);

    m.   Creation of a pedestrian island at the intersection of Park Avenue and McKee Street in State College to provide a safer crossing for pedestrians and cyclists and accommodate the accessibility needs of vision-impaired residents (Centre County);

    n.   Construction of a new two-way industrial access road, realigning a portion of the Nittany & Bald Eagle Railroad Main Line to accommodate the access road, and constructing new sidings and operating tracks for First Quality Tissue's two existing facilities and a proposed new facility (Clinton County);

    o.   Construction of an 85-car unit train loop track in the Keystone Regional Industrial Park to connect with an existing Norfolk Southern main line track and serve a Deer field Farms Service grain elevator facility in Greenwood (Crawford County).

(Doc. No. 1 ¶ 84.)

Plaintiffs assert that these funded programs have "no functional relationship to the Pennsylvania Turnpike," and that the PTC does not possess the financial resources to make the Act 44/89 payments currently and in the future without continually increasing toll rates and debt.  (Id. ¶¶ 84-85, 88.)  Plaintiffs' complaint sets forth "Actual (through 2016) and Expected Toll Increase Resulting from Act 44/89" as contained in an Auditor General Performance Audit as follows:

**TABLE 2**

**Actual (through 2016) and Expected Toll Increase Resulting from Act 44/89
Calendar Year 2009 through 2044**

| Year | Cash | E-Z Pass | | Cash | E-Z Pass |
|------|------|----------|------|------|----------|
| 2009 | 25.0% | 25.0% | 2027 | 3.5% | 3.5% |
| 2010 | 3.0% | 3.0% | 2028 | 3.0% | 3.0% |
| 2011 | 10.0% | 3.0% | 2029 | 3.0% | 3.0% |
| 2012 | 10.0% | - | 2030 | 3.0% | 3.0% |
| 2013 | 10.0% | 2.0% | 2031 | 3.0% | 3.0% |
| 2014 | 12.0% | 2.0% | 2032 | 3.0% | 3.0% |
| 2015 | 5.0% | 5.0% | 2033 | 3.0% | 3.0% |
| 2016 | 6.0% | 6.0% | 2034 | 3.0% | 3.0% |
| 2017 | 6.0% | 6.0% | 2035 | 3.0% | 3.0% |
| 2018 | 6.0% | 6.0% | 2036 | 3.0% | 3.0% |
| 2019 | 6.0% | 6.0% | 2037 | 3.0% | 3.0% |
| 2020 | 6.0% | 6.0% | 2038 | 3.0% | 3.0% |
| 2021 | 5.0% | 5.0% | 2039 | 3.0% | 3.0% |
| 2022 | 5.0% | 5.0% | 2040 | 3.0% | 3.0% |
| 2023 | 5.0% | 5.0% | 2041 | 3.0% | 3.0% |
| 2024 | 5.0% | 5.0% | 2042 | 3.0% | 3.0% |
| 2025 | 5.0% | 5.0% | 2043 | 3.0% | 3.0% |
| 2026 | 4.0% | 4.0% | 2044 | 3.0% | 3.0% |

(Id. ¶ 90.)  Plaintiffs' complaint alleges that between 2006 and 2018, tolls paid by cash

have increased over 200% for all classes of vehicles as follows:

**TABLE 3**

**2006-2018 Increase in Tolls Mainline Roadway East to West Complete Trip Delaware
River Bridge (NJ Border) to Gateway (Ohio Border)**

| Vehicle Toll Class | Gross Vehicle Wt. (1000 lb.) | 2006 Toll | 2018 Toll (Cash) | Increase |
|--------------------|------------------------------|-----------|-------------------|----------|
| 1 | 1-7 | $21.25 | $47.55 | 223% |
| 2 | 7-15 | $31.25 | $69.85 | 223% |
| 3 | 15-19 | $39.00 | $84.35 | 216% |
| 4 | 19-30 | $45.25 | $101.15 | 223% |
| 5 | 30-45 | $63.75 | $141.85 | 222% |
| 6 | 45-62 | $80.75 | $177.90 | 220% |
| 7 | 62-80 | $115.25 | $254.70 | 220% |
| 8 | 80-100 | $150.75 | $333.85 | 221% |
| 9 | Over 100 | $861.00 | $1,836.40 | 213% |

(Id. ¶ 93.)  Plaintiffs' complaint further alleges that each year since 2011, the PTC's toll
revenues have consisted of an amount over 200% of the cost to operate, maintain, and
upgrade the Turnpike as follows:

**TABLE 4**

| PTC | Cost of Turnpike Services | Gross Toll Revenue | Toll Revenue as a % of Cost of Services |
|---|---|---|---|
| 2007 | $369,855,000 | $617,616,000 | 166.99% |
| 2008 | $372,959,000 | $619,150,000 | 166.01% |
| 2009 | $393,364,000 | $638,244,000 | 162.25% |
| 2010 | $378,426,000 | $718,038,000 | 189.74% |
| 2011 | $359,870,000 | $763,856,000 | 212.26% |
| 2012 | $387,506,000 | $797,779,000 | 205.88% |
| 2013 | $412,484,000 | $821,740,000 | 199.22% |
| 2014 | $438,981,000 | $866,066,000 | 197.29% |
| 2015 | $459,780,000 | $934,252,000 | 203.20% |
| 2016 | $471,132,000 | $1,031,620,000 | 218.97% |
| 2017 | $517,103,000 | $1,114,976,000 | 215.62% |

(Doc. No. 1 ¶ 95.)

Based on these alleged numbers, Plaintiffs contend that Turnpike tolls do not
represent a "fair approximation of the use of the Turnpike facilities provided, they are
excessive in relation to the benefits conferred, and they significantly exceed the costs
incurred by PTC to operate and maintain the Pennsylvania Turnpike System."  (Id. ¶ 96.)
Further, Plaintiffs maintain that "PTC's tolls unduly burden interstate commerce by
causing the Pennsylvania Turnpike System to be used as a revenue-generating facility
designed to underwrite expenses incurred by PennDOT in providing services and facilities
throughout the Commonwealth that have no functional relationship to the Pennsylvania
Turnpike System."  (Id. ¶ 97.)

Plaintiffs' complaint cites the 2016 Performance Audit, which states that "[a]nnual
costly toll increases place an undue burden on Pennsylvanians."  (Id. ¶ 98.)  Plaintiffs'

complaint also cites the 2016 Performance Audit's statement that at some point "the average turnpike traveler will be deterred by the increased cost and seek alternative toll-free routes," as well as its conclusion that "[t]he toll prices potentially are already nearing the point where certain consumers will find it too costly and avoid using the Pennsylvania Turnpike." (Id. ¶ 99.)  Plaintiffs' complaint notes that the 2016 Performance Audit recommended that the PTC "[s]eek immediate relief from the legislature to further reduce or eliminate Act 44/89 required payments to PennDOT." (Id. ¶ 100.)

Plaintiffs' complaint further alleges that the enforcement of Act 44/89 "is an official state action that impedes travelers' use of the Pennsylvania Turnpike System," asserting that the right to move freely by automobile "is implicit in the concept of ordered liberty and finds ample support in the Commerce Clause, the Privileges and Immunities Clause, and the Due Process Clause of the Fourteenth Amendment," and that the economic burdens of Act 44/89 payments fall "exclusively on travelers paying the toll," while the economic benefits from Act 44/89 payments "fall substantially on others who do not pay the toll." (Id. ¶¶ 101-04.)  Plaintiffs' complaint concludes that the PTC's "imposition of a toll inflated to guarantee the Act 44/89 payments to PennDOT to support facilities and services having no functional relationship to use of the Turnpike impairs Plaintiffs' and potential class members' constitutional right to travel." (Id. ¶ 105.)

Plaintiffs' complaint alleges a violation of the Commerce Clause of the United States Constitution, asserting that the Clause "prohibits state actions that unduly burden interstate commerce," and "requires that user fees like tolls:  (1) may not discriminate against interstate commerce and travel;  (2) must reflect a fair approximation of the use of facilities for whose benefit they are imposed;  and (3) may not be excessive in relation to

costs incurred by the imposing authority."  (Id. ¶¶ 120-21.)  Plaintiffs' complaint maintains

that:

> PTC's imposition of tolls for use of the Pennsylvania Turnpike constitutes an undue burden on interstate commerce in violation of the Commerce Clause because:  a. the tolls do not reflect a fair approximation of the use of Pennsylvania Turnpike facilities by those upon whom the tolls are imposed; b. the annual toll revenues collected by PTC are excessive and currently represent over 200 percent of the actual cost of making the Pennsylvania Turnpike System available to users; and c. more than half of the annual toll revenues [collected] by PTC [ ] are used to pay for services and facilities having no functional relationship to the operation and maintenance of the Pennsylvania Turnpike System.

(Id. ¶ 122.)  Plaintiffs' complaint further alleges that the provisions of Act 44/89 are

unconstitutional facially or as applied, and that Defendants, "acting under color of state

law, have deprived and continue to deprive Plaintiffs and putative class members of the

right to engage in interstate commerce in violation of their rights under the Commerce

Clause."  (Id. ¶¶ 123-24.)

Plaintiffs' complaint also alleges a violation of the constitutional right to travel,

asserting that the "U.S. Constitution protects individuals' right to travel," which Plaintiffs

allege Defendants are impairing, in that the imposition of an "excessive" toll:

> a. unconstitutionally limits travelers' access to the Pennsylvania Turnpike; b. unduly burdens and impedes motorists' right to travel freely through the Commonwealth; and c. is currently discouraging both business and private travelers from using the Turnpike.

(Id. ¶¶ 127-28.)  Plaintiffs' complaint alleges that Defendants, "acting under color of state

law, have imposed and continue to impose tolls that act as an unconstitutional impediment

to Plaintiffs' and class members' right to travel."  (Id. ¶ 129.)

As relief for these alleged constitutional violations, Plaintiffs seek a declaratory

judgment holding that:

(1) the PTC's imposition of excessive tolls for the use of the Pennsylvania Turnpike by motor carriers engaged in interstate commerce in amounts specifically calculated to provide funds to support facilities and services having no functional relationship to the operation and maintenance of the Pennsylvania Turnpike System constitutes an undue burden on commerce in violation of the Commerce Clause; . . . [and] an unjustified impairment on their constitutional right to travel;  [and]

(2) the provisions of Act 44, as amended by Act 89, that direct the PTC to: (a) make payments to PennDOT to support facilities and services provided by the Commonwealth of Pennsylvania having no functional relation to the operation and maintenance of the Pennsylvania Turnpike, and (b) fund those payments with sums generated through the imposition of tolls upon users of the Pennsylvania Turnpike that do not represent a fair approximation of the use of Turnpike facilities, violate the Commerce Clause of the United States Constitution, both facially or as applied.

(Id. at 38-40.)  Plaintiffs' complaint also seeks a permanent injunction enjoining "Defendants PTC, its Commissioners, and its Executive Officers from imposing constitutionally excessive tolls upon users of the Pennsylvania Turnpike System;" the "PTC from issuing any further bonds or incurring any additional debt for the purpose of making Act 44/89 payments;" the "PTC from using toll revenues to make payments of interest or principal on outstanding bonds issued for the purpose of meeting its Act 44/89 obligations;"  and "Defendants Leslie S. Richards, in her official capacity as Secretary of PennDOT, and Tom Wolf, Governor of Pennsylvania, from enforcing Act 44/89 and from demanding or receiving Act 44/89 payments."  (Id. at 41-42.) Plaintiffs' complaint further seeks a judgment against Defendants PTC and its Commissioners and Executive Officers in favor of Plaintiffs that awards "them refunds of all payments of tolls imposed upon their use of the Pennsylvania Turnpike System in excess of what was reasonably necessary to pay for the cost of operating and maintaining the Pennsylvania Turnpike."  (Id. at 42.)  Finally, Plaintiffs seek an order certifying this proceeding as a class action and an award of reasonable attorneys' fees and costs.  (Id.)

### B.  Procedural History

On March 15, 2018, Plaintiffs filed this putative class action complaint against the PTC Defendants and the Commonwealth Defendants in their individual and official capacities.  (Doc. No. 1.)  On April 2, 2018, Plaintiffs filed a Motion for Preliminary Injunction with supporting brief (Doc. Nos. 19, 20), in connection with their complaint.  Shortly thereafter, Plaintiffs filed a Motion for Expedited Hearing on Plaintiff's Motion for Preliminary Injunction with supporting brief, (Doc. Nos. 22, 23), to which Defendants objected (Doc. No. 25).  On April 13, 2018, the Court denied Plaintiffs' Motion for Expedited Hearing on Plaintiffs' Motion for Preliminary Injunction.  (Doc. No. 33.)  At the same time, the Court issued an Order to Show Cause why a hearing on Plaintiffs' Motion for Preliminary Injunction should not be consolidated with the trial on the merits of this action pursuant to Federal Rule of Civil Procedure 65(a)(2).  (Doc. No. 34.)  Plaintiffs subsequently filed a Motion to Withdraw Motion for Preliminary Injunction (Doc. No. 40), which the Court granted by Order dated April 24, 2018 (Doc. No. 42).

On May 15, 2018, three separate motions to dismiss Plaintiffs' Complaint were filed by certain Defendants:  (1) Craig Shuey, Chief Operating Officer of the PTC (Doc. No. 49);  (2) the Commonwealth Defendants (Doc. No. 50);  and (3) William K. Lieberman, Vice Chair of the PTC (Doc. No. 53).  On the same date, the PTC Defendants filed a motion to dismiss or, in the alternative, for summary judgment (Doc. No. 52).  The motions have been fully briefed.  (Doc. Nos. 51, 54, 55, 56, 66, 70, 71, 72, 76-80).

On May 15, 2018, the Pennsylvania Public Transportation Association, Southeastern Pennsylvania Transportation Authority, and the Port Authority of Allegheny County filed a Motion for Leave to File an Amicus Curiae Brief in Support of Defendants (Doc. No. 57), with

three supporting Declarations (Doc. Nos. 58-60).   The Court granted the Motion by Order dated

May 22, 2018.  (Doc. No. 63.)

Subsequently, on June 13, 2018, Plaintiffs filed a Motion to Certify Class and Appoint

Class Counsel (Doc. No. 73), with a supporting Declaration (Doc. No. 74), and brief (Doc. No.

75).  On June 21, 2018, the Commonwealth Defendants filed a Motion to Stay briefing on the

Motion to Certify Class and Appoint Class Counsel until the Court's disposition of the pending

motions to dismiss (Doc. No. 81), with a brief in support (Doc. No. 82).  The Court granted the

Motion to Stay briefing and consideration of the Motion to Certify Class by Order dated June 25,

2018.  (Doc. No. 83.)

On June 28, 2018, Plaintiffs filed a Motion for Partial Summary Judgment on the Issue of

Liability (Doc. No. 84), with a brief in support thereto (Doc. No. 85), and a statement of facts

(Doc. No. 86), with supporting Declaration (Doc. No. 87).  On July 20, 2018, Defendants Shuey

and Lieberman filed briefs in opposition to Plaintiff's motion (Doc. Nos. 93, 94).  On the same

date, the PTC Defendants filed a brief in opposition to the motion (Doc. No. 88), as well as an

answer to statement of facts (Doc. No. 89).  The Commonwealth Defendants also filed a brief in

opposition (Doc. No. 90), an answer to statement of facts (Doc. No. 91), and a supporting

Declaration (Doc. No. 92), on the same date.  On August 3, 2018, Plaintiffs filed a reply brief in

further support of their motion (Doc. No. 97), as well as responses to the answers to statement of

facts filed by the Defendants (Doc. Nos. 98, 99).

On November 28, 2018, the PTC Defendants and the Commonwealth Defendants filed a

Notice of Supplemental Authority. (Doc. No. 102.)  On November 29, 2018, Plaintiffs filed

Objections to the Notice (Doc. No. 103), as well as a Supplement to their Statement of Material

Facts in support of their Motion for Partial Summary Judgment (Doc. No. 104).  The

Commonwealth Defendants filed an Answer to Plaintiffs' Supplement to their Statement of Material Facts on December 10, 2018.  (Doc. No. 105.)

## II.    LEGAL STANDARDS

### A.  Motion to Dismiss

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  <u>Philips v. Cty. Of Allegheny</u>, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted."  <u>See</u> Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inference that can be drawn therefrom, viewed in the light most favorable to the plaintiff.  <u>See</u> <u>In re Ins. Brokerage Antitrust Litig.</u>, 618 F.3d 300, 314 (3d Cir. 2010).  The Court's inquiry is guided by the standards of <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).  Under <u>Twombly</u> and <u>Iqbal</u>, pleading requirements have shifted to a "more heightened form of pleading."  <u>See</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).  To avoid dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible.  <u>Id.</u>  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in <u>Iqbal</u>, "where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6):  (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth;  and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).  A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'"  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE §1357 (3d ed. 2004)).

### B.   Motion for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is

material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Further, a party may not defeat a

motion for summary judgment with evidence that would not be admissible at trial.  Pamintuan v.

Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999)).

### C.  Facial Versus As-Applied Constitutional Challenges

"A party asserting a facial challenge 'must establish that no set of circumstances exists under

which [an act] would be valid.'"  Heffner v. Murphy, 745 F.3d 56, 65 (3d Cir. 2014) (quoting

United States v. Mitchell, 652 F.3d 387, 405 (3d Cir. 2011)).  "This is a particularly demanding

standard and is the 'most difficult challenge to mount successfully.'"  Id. (quoting United States

v. Salerno, 481 U.S. 739, 745 (1987)).  "By contrast, '[a]n as-applied attack . . . does not contend

that a law is unconstitutional as written but that its application to a particular person under

particular circumstances deprived that person of a constitutional right."  Id. (alterations in

original) (quoting United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010)).  The United

States Supreme Court "typically disfavor[s] facial challenges" because "[t]hey 'often rest on

speculation,' can lead courts unnecessarily to anticipate constitutional questions or formulate

broad constitutional rules, and may prevent governmental officers from implementing laws 'in a

manner consistent with the Constitution.'"  See John Doe No. 1 v. Reed, 561 U.S. 186, 230

(2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)).

"If a litigant decides to bring both types of challenge, a court's ruling on one might affect the

other."  Knick v. Twp. of Scott, 862 F.3d 310, 321 (3d Cir. 2017) (citing Heffner, 745 F.3d at 65

n.7), cert. granted in part, Knick v. Twp. of Scott, ___ U.S. ___ (2018).  "But if a litigant loses an

as-applied challenge because the [C]ourt rules as a matter of law that the statute or ordinance was

constitutionally applied to her, it follows a fortiori that the law is not unconstitutional in all

applications."  Id. at 321 (citing Dickerson v. Napolitano, 604 F.3d 732, 741 (2d Cir. 2010)).

## III.    DISCUSSION

As noted above, Plaintiffs' complaint asserts that Act 44/89 violates both (1) the dormant Commerce Clause of the United States Constitution, and (2) the constitutional right to travel. The Commonwealth Defendants and the PTC Defendants' motions to dismiss both argue that Plaintiffs' complaint fails to state a claim on either ground.  The Court first addresses Defendants' challenges to Plaintiffs' dormant Commerce Clause claim.

### A.  Plaintiffs' Claim that Act 44/89 Violates the dormant Commerce Clause

#### 1.   Applicable Legal Standard

The Commerce Clause of the United States Constitution grants Congress the authority to "regulate Commerce . . . among the several States."  U.S. CONST. ART. I, § 8, cl. 3.  The Commerce Clause also contains an implied requirement, known as the "dormant" Commerce Clause, that "states not 'mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'"  Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 462 F.3d 249, 261 (3d Cir. 2006) (quoting Granholm v. Heald, 544 U.S. 460, 472 (2005)).

The Supreme Court recently discussed the two principles that govern the authority of a State to regulate interstate commerce:  "[f]irst, state regulations may not discriminate against interstate commerce;  and second, States may not impose undue burdens on interstate commerce."  South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2090-91, __ U.S. __ (2018).  The Court stated that laws "that discriminate against interstate commerce face 'a virtually per se rule of invalidity.'"  Id. at 2091 (quoting Granholm, 544 U.S. at 470).  However, "[s]tate laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local

benefits.'" Id. (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)). As the Supreme Court noted, "these two principles guide the courts in adjudicating cases challenging state laws under the Commerce Clause." Id.

Further, the Supreme Court has recognized that "[w]here state or local government action is specifically authorized by Congress, it is not subject to the [dormant] Commerce Clause even if it interferes with interstate commerce." White v. Mass. Council of Constr. Emp'rs, Inc., 460 U.S. 204, 213 (1983). In making such an authorization, "Congress must manifest its unambiguous intent." Wyoming v. Oklahoma, 502 U.S. 437, 458 (1992). Stated differently, congressional "'intent and policy' to sustain state legislation from attack under the Commerce Clause" must be "'expressly stated.'" Sporhase v. Nebraska, ex rel. Douglas, 458 U.S. 941, 960 (1982) (quoting New England Power Co. v. New Hampshire, 455 U.S. 331, 343 (1982)). However, "[t]here is no talismanic significance to the phrase 'expressly stated,'" as it "merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the [d]ormant Commerce Clause congressional intent must be unmistakably clear." South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 91 (1984).

### 2. Arguments of the parties

#### a. Commonwealth Defendants

In arguing that Plaintiffs' complaint fails to state a claim that Act 44/89 violates the dormant Commerce Clause, the Commonwealth Defendants maintain that: (1) Congress has specifically authorized state transportation authorities to use toll revenues for any purpose for which federal transportation funds may be used; and (2) even in the absence of specific congressional authorization, Act 44/89 does not impose a burden on interstate commerce that is

"clearly excessive in relation to the putative local benefits" such that Act 44/89 violates the dormant Commerce Clause.  (Doc. No. 51 at 17-30.)

In arguing that Congress has specifically authorized the state statutory scheme such that Act 44/89 is invulnerable to constitutional attack on dormant Commerce Clause grounds, the Commonwealth Defendants point to the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), federal legislation that permits public transportation authorities to use toll revenues from toll facilities initially for debt service on bonds and for operation and maintenance of the toll facilities, and secondarily (to the extent additional funds are available) for "any other purpose for which Federal funds may be obligated by a State" under Title 23 of the U.S. Code. (Doc. No. 51 at 18-19 (citing 23 U.S.C. § 129(a)(3)(A).).)[7]  Pursuant to ISTEA and a 2015 amendment through the Fixing America's Surface Transportation ("FAST") Act,[8] the

---

[7] 23 U.S.C. § 129(a)(3) provides as follows:
    (3) Limitations on the use of revenues. –
        (A) In general. – A public authority with jurisdiction over a toll facility shall use all toll revenues received from operation of the toll facility only for –
            (i)    debt service with respect to the projects on or for which the tolls are authorized, including funding of reasonable reserves and debt service on refinancing;
            (ii)   a reasonable return on investment of any private person financing the project, as determined by the State or interstate compact of States concerned;
            (iii)  any costs necessary for the improvement and proper operation and maintenance of the toll facility, including reconstruction, resurfacing, restoration, and rehabilitation;
            (iv)  if the toll facility is subject to a public-private partnership agreement, payments that the party holding the right to toll revenues owes to the other party under the public-private partnership agreement;  and
            (v)   if the public authority certifies annually that the tolled facility is being adequately maintained, any other purpose for which Federal funds may be obligated by a State under this title.

23 U.S.C. § 129(a)(3).

[8] Pub. L. No. 114-94, 129 Stat. 1311 (2015).

Commonwealth Defendants argue that, under Section 1109(b) of the FAST Act, codified at 23

U.S.C. § 133(b), Congress has specifically authorized Turnpike toll revenues to be used for:  (1)

any of fourteen categories of projects described in 23 U.S.C. § 133(b);  (2) any of the categories

of projects described in pre-FAST Act § 133(b);  and (3) any of the broad categories of

transportation alternatives set forth in pre-FAST Act § 101(a)(29).  (Id. at 20-21.)

The Commonwealth Defendants maintain that the projects that Plaintiffs assert should

not be funded with Turnpike toll revenues (as described in paragraph 84 of their complaint) are

all projects that fit within the broad authorization of ISTEA, as amended by the FAST Act.  (Id.

at 21-22.)  The Commonwealth Defendants admit that two projects cited by Plaintiffs – airport

terminal improvements and construction of a train track in an industrial park – may not be

covered by Section 133(b), but maintain, however, that Plaintiffs allege only that these projects

can receive funds from the MTF (Doc. No. 1 ¶ 79), not that the projects were paid for with funds

transferred from the PTC and PennDOT, as the MTF receives, in addition to the $30 million

from the PTC transfer to PennDOT, funds from vehicle and driver fees (Doc. No. 51 at 22)

(citing 74 Pa. C.S. § 1904(b)(3); 2018-19 Governor's Executive Budget at H49 (Feb. 6,

2018)) (indicating that $74-$80 million is deposited in the MTF annually from driver and vehicle

fees)).[9]  Similarly, the Commonwealth Defendants argue that, as to Plaintiffs' apparent challenge

to the use of Act 44/89 funds to pay for programs of statewide significance such as intercity

passenger rail and bus services (Doc. No. 1 ¶ 83), even if such programs are not authorized to

receive funds under Title 23, the programs receive the majority of their funding from sales tax

---

[9]  The Commonwealth Defendants correctly note that the Court may consider "matters of public record" when deciding a motion to dismiss, including administrative agency filings, "materials like decision letters of government agencies and published reports of administrative bodies," and other "records of a government agency."  Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).

funds, as opposed to Act 44/89 transfer payments  (Doc. No. 51 at 23).[10]  In sum, the

Commonwealth Defendants maintain that given the multiple sources of funding for the projects

mentioned by Plaintiffs, even if Section 133(b) does not authorize any of those projects,

Plaintiffs have not and cannot plead that Act 44/89 toll revenues are utilized for such programs.

(Id.)

In further support of their position, the Commonwealth Defendants point to a relatively

recent opinion from the United States Court of Appeals for the Second Circuit in American

Trucking Associations, Inc. v. New York State Thruway Authority, 886 F.3d 238 (2d Cir. 2018)

(hereafter "ATA II"), which held that ISTEA foreclosed a dormant Commerce Clause challenge

to the use of toll revenues for transportation purposes unrelated to the tolling facilities that

generated those revenues on the ground that Congress expressly authorized that use in ISTEA.

(Doc. No. 51 at 23-24.)

The Commonwealth Defendants further argue that, even if the Court should find that

Congress did not expressly authorize the challenged use of Turnpike toll revenues, removing

them from potential dormant Commerce Clause attack, Plaintiffs' dormant Commerce Clause

claim still fails because Act 44/89 does not impose "discriminatory burdens on interstate

commerce."  (Id. at 25.)  In so arguing, the Commonwealth Defendants maintain that the

applicable standard for evaluating any potential burden imposed by Act 44/89 on interstate

commerce is provided by Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), which states that in

determining if a challenged statutory scheme violates the dormant Commerce Clause, the Court

is to assess "whether the [state statute] imposes a burden on interstate commerce that is 'clearly

---

[10]  On this point, the Commonwealth Defendants cite 74 Pa. C.S. §§ 1506(c)(1) and (e)(3)(i),
which provide that 13.24% of sales tax revenues deposited in the PTTF are allocated to programs
of statewide significance, as well as the 2018-19 Governor's Executive Budget at H67.

excessive in relation to the putative local benefits.'" <u>C & A Carbone, Inc. v. Town of Clarkstown</u>, 511 U.S. 383, 390 (1994) (quoting <u>Pike</u>, 397 U.S. at 142).  The Commonwealth Defendants maintain that, when analyzed under the <u>Pike</u> test, the facts alleged in Plaintiffs' complaint do not support a reasonable inference that the usage of Turnpike tolls for other Commonwealth transportation projects burdens interstate commerce.  (Doc. No. 51 at 26.)  The Commonwealth Defendants argue that in crafting the allegations of their complaint and their dormant Commerce Clause challenge, Plaintiffs impermissibly rely on Supreme Court jurisprudence relating to user fees, as set forth in <u>Northwest Airlines v. Kent</u>, 510 U.S. 355 (1994), as opposed to the <u>Pike</u> test.  (<u>Id.</u> at 26-27.)

Nevertheless, the Commonwealth Defendants maintain that even when analyzed under the jurisprudence relied on by Plaintiffs, Plaintiffs' complaint still fails to state a claim for a violation of the dormant Commerce Clause.  (<u>Id.</u> at 27.)  In <u>Northwest Airlines</u>, the Supreme Court stated that a "levy is reasonable . . . if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce."  <u>Northwest Airlines</u>, 510 U.S. at 369 (quoting <u>Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.</u>, 405 U.S. 707, 716-17 (1972)).[11]  The Commonwealth Defendants argue that, in evaluating "fair approximation of use" and relationship to benefits conferred, Plaintiffs improperly focus narrowly on the Turnpike while ignoring the fact that the Turnpike is part of a larger transportation system in Pennsylvania, and that "[t]hose who pay tolls to use the Turnpike benefit from not only access to the Turnpike itself but from the maintenance, operation, and improvement of the entire transportation system, of which the Turnpike is only one part."  (Doc. No. 51 at 27.)  The Commonwealth Defendants

---

[11] The Court refers to this test as the "<u>Evansville/Northwest Airlines</u>" test.

point to Supreme Court precedent that they maintain has upheld fees imposed for the use of a state's highways, even when those "fees do not 'reflect with exact precision every gradation in use' of those highways."  (Id. at 28-29) (quoting Aero Mayflower Transit Co. v. Bd. of R.R. Comm'rs, 332 U.S. 495, 504 (1947), overruled on other grounds, Am. Trucking Ass'ns, Inc. v. Smith, 496 U.S. 167 (1990)).  Accordingly, the Commonwealth Defendants argue that Plaintiffs' focus on the cost of Turnpike tolls as compared to the cost of operating and maintaining the Turnpike is impermissibly narrow, maintaining that "the fact that plaintiffs (or other putative class members) might not use other state transportation facilities funded with Turnpike toll revenues does not render the tolls they pay unconstitutionally excessive."  (Id. at 29-30.)  For all of these reasons, the Commonwealth Defendants maintain that the Plaintiffs' complaint fails to state a claim for a violation of the dormant Commerce Clause.

### b.  PTC Defendants

The PTC Defendants similarly argue that Plaintiffs' complaint fails to state a claim for a violation of the dormant Commerce Clause because Plaintiffs rely on the Evansville/Northwest Airlines test, as opposed to the Pike test, which the PTC Defendants maintain is the correct test for evaluating whether the allegations of Plaintiffs' complaint state a claim for violation of the dormant Commerce Clause.  (Doc. No. 56 at 13-22.)  Second, the PTC Defendants maintain that, assuming arguendo that Plaintiffs' complaint states a claim for violation of the dormant Commerce Clause, because Congress has specifically authorized the PTC to collect toll revenues in excess of those needed to operate the Turnpike, the PTC Defendants are entitled to summary judgment on Plaintiffs' dormant Commerce Clause claim.  (Id. at 23-30.)[12]

---

[12]  As noted above, the PTC Defendants' motion is framed as a motion to dismiss or, in the alternative, for summary judgment.

As to their first argument, the PTC Defendants maintain that the correct test in the Third Circuit for evaluating dormant Commerce Clause challenges is that set forth in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970).  (Id. at 11-12.)  The PTC Defendants argue that the Evansville/Northwest Airlines test is inapplicable to this case, as Northwest Airlines is a case primarily concerning statutory interpretation, or whether certain user fees are prohibited by a particular statute.  (Id. at 13-14.)  Moreover, the PTC Defendants point out that at the conclusion of the Supreme Court's opinion in Northwest Airlines, the Court addressed whether the fees at issue also violated the dormant Commerce Clause, and concluded that they did not because express congressional authorization insulated the particular state statute from dormant Commerce Clause attack.  (Id. at 14-15.)  The PTC Defendants note that at the same time, the Supreme Court concluded that, even if its determination as to congressional authorization was incorrect, any dormant Commerce Clause challenge to the user fees at issue failed based on the test first articulated in Evansville-Vanderburgh.  (Id. at 15.)  However, the PTC Defendants maintain that the Supreme Court has never treated that conclusion as the holding of the case, and, therefore, there is no basis to expand the Evansville-Vanderburgh analysis beyond the scope of that case.  (Id. at 15-16.)

In support of their argument that Pike provides the correct test against which to measure the allegations of Plaintiffs' complaint, the PTC Defendants note that Pike has been recently applied by the Supreme Court in dormant Commerce Clause cases, pointing to Department of Revenue of Kentucky v. Davis, 553 U.S. 328, 353 (2008) and United Haulers Association, Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U.S. 330, 346 (2007). (Id. at 16.) The PTC Defendants quote a Second Circuit case, Selevan v. New York Thruway Authority, 584 F.3d 82, 96 (2d Cir. 2009), which acknowledged that "the [Supreme] Court has not used the

<u>Northwest Airlines</u> test to evaluate the constitutionality of a highway toll," and further note that

the Third Circuit has similarly never utilized the <u>Evansville/Northwest Airlines</u> test to evaluate a

dormant Commerce Clause challenge to a highway toll, but instead has utilized variants of <u>Pike</u>'s

balancing test.  (<u>Id.</u> at 15-16) (citing <u>Wallach v. Brezenoff</u>, 930 F.2d 1070 (3d Cir. 1991) and

<u>Yerger v. Mass. Tp. Auth.</u>, 395 F. App'x 878 (3d Cir. 2010)).

      The PTC Defendants then turn to an analysis of the allegations of Plaintiffs' complaint

under the <u>Pike</u> test.[13]  They note that in <u>Pike</u>, the Supreme Court explained that "where the

statute addresses a legitimate local public interest, and its effects on interstate commerce are only

incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in

relation to the putative local benefits."  (Doc. No. 56 at 18) (quoting <u>Pike</u>, 397 U.S. at 142).  The

PTC Defendants argue that the benefits of Act 44/89 to Pennsylvania citizens, as expressed in

Act 89 itself, are significant, citing the findings of the General Assembly in enacting Act 89.[14]

---

[13] The PTC Defendants first note that heightened scrutiny is inapplicable to any review of the challenged tolling scheme, as Act 44/89 does not on its face discriminate against interstate commerce in favor of in-state interests in that both in-state and out-of-state drivers are charged identical tolls and Plaintiffs' complaint does not allege otherwise.  (Doc. No. 56 at 17-18.)  On this point, the PTC Defendants refer to <u>Heffner v. Murphy</u>, 745 F.3d 56, 72 (3d Cir. 2014), where the Third Circuit stated that a "dormant Commerce Clause inquiry only considers whether the imposition of the limitation falls equally upon in-state and out-of-state [residents];  if so, there is clearly no discrimination in favor of Pennsylvania [residents]," and therefore "we do not subject it to heightened scrutiny under dormant Commerce Clause analysis."  <u>Id.</u>  In <u>Heffner</u>, the Third Circuit further stated that "[i]f we determine that heightened scrutiny is inapplicable because the [statute's] provisions do not discriminate in favor of in-state interests, we then must balance interests pursuant to <u>Pike</u>[.]"  <u>Id.</u> at 70.  On this basis, the PTC Defendants maintain that in the absence of any allegations of discriminatory purpose or effect, the Court should properly apply the <u>Pike</u> balancing test when analyzing the challenged statute.  (Doc. No. 56 at 18.)

[14]  In the Preamble to Act 89, the General Assembly found:

    The Commonwealth's transportation system provides access to employment, educational
    services, medical care and other life-sustaining services for all residents of this
    Commonwealth, including senior citizens and persons with disabilities.
    . . .

The PTC Defendants maintain that this "multi-faceted funding assistance" provided by Act 44/89 to various transportation programs in the Commonwealth of Pennsylvania promotes the health, safety and welfare of Pennsylvania citizens.  (Id. at 21.)

As to the second part of the Pike balancing test – whether the burden imposed on interstate commerce by the statute is "clearly excessive" in relation to local benefits conferred by the statute – the PTC Defendants argue that Plaintiffs' complaint fails to "identify any differential burden placed on interstate commerce by the [PTC's] toll practices."  (Id. at 21-22.) On this point, the PTC Defendants quote Norfolk Southern Corporation v. Oberly, 822 F.2d 388, 406 (3d Cir. 1987), where the Third Circuit stated that "[t]he 'incidental burden on interstate commerce' appropriately considered in Commerce Clause balancing is the degree to which state

─────────────────────

There is urgent public need to reduce congestion, increase capacity, improve safety and promote economic efficiency of transportation facilities throughout this Commonwealth.

The Commonwealth has limited resources to fund the maintenance and expansion of its transportation facilities. . . .the Commonwealth's transportation system is underfunded by $3,500,000,000 and [it is] projected that amount will grow to $6,700,000,000 by 2030 without additional financial investment by the Commonwealth.

To ensure the needs of the public are adequately addressed, funding mechanisms must be enhanced to sustain the Commonwealth's transportation system in the future.

The utilization of user fees establishes a funding source for transportation needs that spreads the costs across those who benefit from the Commonwealth's transportation system.
. . .

In order to ensure a safe and reliable system of public transportation, aviation, ports, rail and bicycle and pedestrian facilities, other transportation-related user fees must be deposited in the Public Transportation Trust Fund and the Multimodal Transportation Fund.

(Doc. No. 55-4 at 3, Preamble to Act of Nov. 25, 2013, P.L. 974, No. 89 at ¶¶ (3), (5)-(9), (11).)

action incidentally discriminates against interstate commerce relative to intrastate commerce.  It is a comparative measure."  Id.  The PTC Defendants maintain that where tolls equally burden intrastate and interstate commerce (or, in other words, in-state and out-of-state drivers are charged identical tolls), no differential burden exists for purposes of Pike balancing.  (Doc. No. 56 at 22.)  Accordingly, for these reasons, the PTC Defendants argue that Plaintiffs' complaint fails to set forth facts that support a reasonable inference that Act 44/89 violates the dormant Commerce Clause.  (Id. at 22.)[15]

As noted above, the PTC Defendants argue that, in the event that Plaintiffs' complaint is not dismissed for failure to state a claim under the dormant Commerce Clause, they are entitled to summary judgment on Plaintiffs' dormant Commerce Clause claim because Congress has specifically authorized the PTC's toll structure as established in Act 44/89.  (Id. at 23.)  Like the Commonwealth Defendants, they analogize the instant case to American Trucking Associations, Inc. v. New York State Thruway Authority, 886 F.3d 238 (2d Cir. 2018) ("ATA II"), where the Second Circuit held that Congress – through ISTEA – authorized the New York State Thruway to collect and expend toll revenue on non-Thruway-related projects.  Similar to the Commonwealth Defendants, the PTC Defendants point to ISTEA as the source of congressional authorization for the PTC's toll structure, as established in Act 44/89, arguing that, as the Second Circuit stated in ATA II, "ISTEA freed states from their obligation  . . . to repay the federal government should they continue to collect tolls after retiring outstanding debts, and granted

---

[15]  The PTC Defendants further maintain that, even assuming that the Act 44/89 tolling structure could be viewed as imparting some burden on interstate commerce, by statute, much of the Act 44/89 funds benefit entities acting in interstate commerce, such as SEPTA and the Port Authority of Allegheny County, and, therefore, "toll revenues are diverted from one channel of interstate commerce for the benefit of another.  Thus, there is no net non-incidental burden on interstate commerce."  (Doc. No. 56 at 22 n.3.)

them greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects."  ATA II, 886 F.3d at 242 (footnotes omitted).

In concluding that ISTEA specifically authorized a toll structure that permitted the expenditure of toll revenues on non-tolled road projects, the Second Circuit in ATA II described ISTEA's departure from the prior statutory framework as follows:

> [S]ection 1012(a) authorized state public authorities to collect highway tolls without repaying the federal government, so long as those funds "will be used first for debt service, for reasonable return on investment of any private person financing the project, and for the costs necessary for the proper operation and maintenance of the toll facility."  Once a state certified adequate maintenance, it could use any excess toll revenues "for any purpose for which Federal funds may be obligated by a State under [Title 23]."

Id. at 242 (quoting § 1012(a)(3), 105 Stat. at 1936-37).

The PTC Defendants point to record evidence of the PTC's entry into an agreement with the Federal Highway Administration ("FHWA Agreement") pursuant to ISTEA permitting the PTC to use "toll revenues resulting from the operation of the toll facility" – defined as the entire Pennsylvania Turnpike System, including "any future system extensions" – "first for debt service," and further providing that "the [PTC] is entitled to use any toll revenues in excess of amounts required under [ISTEA, § 1012(a)], for any purpose for which [f]ederal funds may be obligated by a State under Title 23, United States Code."  (Doc. No. 55 ¶ 24.)  Thus, the PTC Defendants maintain that based on ISTEA § 1012(a) and the FHWA Agreement negotiated pursuant to it, Congress has expressly authorized the PTC to utilize toll revenues on (1) debt service and (2) for "any purpose for which [f]ederal funds may be obligated by a State under Title 23, United States Code."[16]  (Doc. No. 56 at 25-26.)

---

[16] The PTC Defendants point out that in 2012, an amendment to Section 129(a)(3) expanded the categories of expenses to which toll revenues could be dedicated in the Moving Ahead for Progress in the 21st Century Act ("MAP-21"), Pub. L. No. 112-141, Div. A, Title I, § 1512, 126

The PTC Defendants maintain that the PTC's use of toll revenues to satisfy Act 44/89 obligations is fully compliant with this authorization.  (Doc. No. 56 at 26.)  The PTC Defendants explain that the PTC makes its annual $450 million payment to PennDOT by "(1) transferring $50 million in funds from operating revenues and (2) incurring 30-year subordinated debt to fund the remaining $400 million due."  (Id.) (citing Doc. No. 55 ¶ 12).  The PTC Defendants note that the PTC "makes debt service payments of principal and interest to subordinated bondholders, also out of operating revenue" to service that debt.  (Id.) (citing Doc. No. 55 ¶¶ 13-14).

The PTC Defendants maintain that both uses of funds are expressly authorized and constitutionally permissible under the FHWA Agreement.  (Doc. No. 56 at 27.)  Pointing to record evidence, the PTC Defendants maintain that "[a]ll but $50 million in annual Act 44/89-related toll revenue expenditures are for service on the [PTC]'s subordinated debt obligations," (Id. at 27) (citing Doc. No. 55 at ¶ 12), a purpose permitted by the plain language of the FHWA Agreement entered into pursuant to ISTEA Section 1012(a), which does not restrict the types of "debt service" for which toll revenues can be dedicated (Id. at 27).  As to the remaining $50 million transferred annually from the PTC to PennDOT, the PTC Defendants maintain that Section 1012(a) of ISTEA, as well as the FHWA Agreement, permit the PTC to utilize toll revenues for "any purpose for which [f]ederal funds may be obligated by a State under Title 23, United States Code," providing that the "State certifies annually that the tolled facility is being adequately maintained."  (Id. at 27) (quoting ISTEA § 1012(a)).

---

Stat. 405, 568-69 (2012).  The PTC Defendants note that subsequent to this amendment, the FHWA issued interpretive guidance providing that "[f]or toll facilities that have executed Section 129 tolling agreements prior to October 1, 2012, the terms of those agreements will continue in force."  (Doc. No. 56 at 26 n.4) (citing Doc. No. 55 ¶ 34).  Accordingly, the PTC Defendants maintain that the PTC "continues to act under this prior congressional authorization." (Doc. No. 56 at 26 n.4) (citing Doc. No. 55 ¶ 25).

The PTC Defendants point to record evidence that they maintain supports their position that the PTC has made the necessary certifications of adequate maintenance to the FHWA for the period ending May 31, 2016.  (Id. at 27-28) (citing Doc. No. 55 ¶ 27).  The PTC Defendants admit that the certifications have not been made on a yearly basis due to the limited capacity of the Commonwealth of Pennsylvania's Bureau of Audits, but argue that nothing in ISTEA or the FHWA Agreement sets a date by which audits must be performed, and moreover, the Secretary of Transportation, the individual "charged with enforcement of 'the limitations on the use of revenues described in' Section 129(a)," has not found the PTC in non-compliance with those limitations.  (Id. at 28) (citing Doc. No. 55 ¶ 30).  Therefore, the PTC Defendants maintain that they are "entitled 'to allocate excess toll revenues . . . for any project eligible to receive federal assistance under Title 23.'"  (Id. at 28) (quoting ATA II, 886 F.3d at 246).

Accordingly, the PTC Defendants maintain that the issue of express congressional authorization turns on whether the funds transferred from the PTC to PennDOT pursuant to Act 44/89 are "expended on a 'project eligible to receive federal assistance under Title 23.'"  (Id. at 29) (citing ATA II, 886 F.3d at 246).   The PTC Defendants argue that all but one of the expenditures of toll revenues identified by Plaintiffs in their complaint are facially authorized under Title 23, with the possible exception of the Erie International Airport terminal building, for which the PTC Defendants maintain that authorization is unclear "because of Plaintiffs' vague description in the [c]omplaint." (Id. at 29 & n.6.)  As to that project, the PTC Defendants point to record evidence seeking to demonstrate that the project constituted only $700,000 in expenditures, an amount which they argue, even if not congressionally authorized, is de minimis.  (Id. at 29) (citing Doc. No. 55 ¶ 33).  For all of these reasons, the PTC Defendants maintain that, assuming arguendo that Plaintiffs' complaint states a dormant Commerce Clause claim,

congressional authorization bars Plaintiffs' dormant Commerce Clause challenge to Act 44/89.

(Id.)

### c.  Plaintiffs

In response to the arguments of the Commonwealth Defendants and the PTC Defendants, Plaintiffs argue first that their complaint states a claim for violation of the dormant Commerce Clause under the Evansville/Northwest Airlines test, which they maintain is the standard that governs in a dormant Commerce Clause challenge to allegedly excessive tolls or user fees. (Doc. No. 70 at 24-35.)  Second, Plaintiffs argue that through ISTEA, Congress has not authorized states to impose turnpike tolls free of limitations imposed by the dormant Commerce Clause.  (Id. at 41-53.)  In addition, Plaintiffs maintain that even if Congress did authorize states to utilize excess toll revenues on unrelated transportation projects, Defendants have not complied with the limitation placed on the exercise of that authority by failing to certify annually that the Turnpike is adequately maintained.  (Id. at 53-63.)

As to the correct standard applicable to Plaintiffs' dormant Commerce Clause challenge, Plaintiffs maintain that various Circuit Courts of Appeal have applied the Evansville/Northwest Airlines test to the evaluation of tolls and other user fees, and argue that this Court (and the Third Circuit) should do likewise.  (Id. at 24-26.)  Under the Evansville/Northwest Airlines test, tolls are reasonable if they "(1) [are] based on some fair approximation of use of the facilities, (2) [are] not excessive in relation to the benefits conferred, and (3) [do] not discriminate against interstate commerce."  Northwest Airlines, 410 U.S. at 369 (citing Evansville, 405 U.S. at 716-17).  Plaintiffs' dormant Commerce Clause claim is based on their argument that Act 44/89's toll structure violates prongs (1) and (2) of the Evansville/Northwest Airlines test.  (Doc. No. 70 at 25.)

In support of their argument, Plaintiffs point to a non-precedential 2010 Third Circuit opinion in Yerger v. Massachusetts Turnpike Authority, 395 F. App'x 878 (3d Cir. 2010), as well as a 1991 Third Circuit opinion in Wallach v. Brezenoff, 930 F.2d 1070 (3d Cir. 1991). Plaintiffs note that in Yerger, after conducting an analysis under Pike to determine whether a program requiring out-of-state turnpike users to sign up for a state discount program violated the dormant Commerce Clause, the Court examined the toll amount and cited the Evansville/Northwest Airlines test in concluding that the tolls were "'assessed uniformly in direct proportion to the use of the toll facilities and ha[d] not been shown to be excessive.'" (Doc. No. 70 at 27) (quoting Yerger, 395 F. App'x at 884 n.3).  Plaintiffs maintain that in Wallach, the court determined that the tolls at issue "represented a fair approximation of the use conferred" and the tolling authority expended toll revenue on projects "functionally related" to the toll system, echoing the Evansville/Northwest Airlines standard.  (Id. at 27) (citing Wallach, 930 F.2d at 1071-72).  Accordingly, Plaintiffs maintain that Evansville/Northwest Airlines, not Pike, sets forth the appropriate test for analyzing allegedly excessive user fees and tolls under the dormant Commerce Clause.  (Id. at 27.)

Plaintiffs maintain that the Supreme Court has recognized that the Pike test is appropriate for laws "directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." (Doc. No. 70 at 28 ) (citing United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 346 (2007)).  Plaintiffs point out that Evansville and Northwest Airlines were decided after Pike, but in neither case did the Supreme Court use the Pike test to evaluate the user fees at issue in those cases.  (Id. at 29.)  Plaintiffs further argue that no court has utilized Pike to evaluate whether tolls are excessive and therefore violative of the dormant Commerce Clause.  (Id.)

36

Plaintiffs then turn to an analysis of Act 44/89's tolling structure under the Evansville/Northwest Airlines test, and argue that toll receipts, which they allege have exceeded 200 percent of the cost to maintain and operate the Turnpike, are not based on some fair approximation of the use of the Turnpike and are excessive in relation to the benefits conferred. (Id. at 30-34.)  Plaintiffs point to the allegations of their complaint regarding the non-highway purposes to which Act 44/89 revenues are dedicated and argue that it is not sufficient for the Commonwealth Defendants to assert that providing "access to an extensive and well-maintained transportation system in the Commonwealth" justifies the wide-ranging expenditure of Act 44/89 toll revenues and confers a benefit on all users of the Turnpike that fairly approximates their use of the same.  (Id. at 30) (quoting Doc. No. 51 at 22).  In sum, Plaintiffs maintain that the allegations of their complaint support a reasonable inference that the Pennsylvania Turnpike tolls (and the Act 44/89 toll structure that governs them) are not based on some fair approximation of the use of the Turnpike and are excessive under the Evansville/Northwest Airlines standard.

As noted above, Plaintiffs urge the Court to reject Defendants' claim of congressional authorization because Congress has not unambiguously authorized States to impose highway tolls free of dormant Commerce Clause limitations.  (Id. at 41.)  Plaintiffs maintain that "for Congress to approve State action that would otherwise violate the Commerce Clause, Congress must 'affirmatively contemplate otherwise invalid state legislation' and express an unmistakably clear, unambiguous intent to approve such legislation in the text of a federal statute."  (Id. at 43) (quoting Wunnicke, 467 U.S. at 91).  Further, Plaintiffs point out that the State "carries the 'burden of demonstrating a clear and unambiguous intent on behalf of Congress to permit' behavior that would otherwise be unconstitutional under the dormant Commerce Clause."  (Id.) (quoting Wyoming, 502 U.S. at 458).

Plaintiffs maintain that there exists an "historic animus" against federal funding of toll roads, and argue that while "States are free to build, operate or regulate toll facilities largely as they see fit," practically, "the flexibility of State and local governments to deal with toll facilities is constrained by two factors at the federal level." (Id. at 45.)  Plaintiffs describe those two factors as follows:  (1) the dormant Commerce Clause, which "restricts States from imposing undue burdens upon interstate commerce by means of toll facilities;" and (2) "if States wish to participate in federal highway funding programs, they are required to conform to federal requirements and operate tolled facilities in conformity with federal standards." (Id.)

Plaintiffs argue that Section 1012(a) of ISTEA, the statute upon which Defendants rely for congressional authorization of the Act 44/89 toll structure, established certain conditions that States were required to satisfy in order to qualify for federal funds for state-tolled facilities, but did not "authorize States or state-tolling authorities to do anything." (Id. at 46.)  Plaintiffs discuss the origins of ISTEA and specifically, Section 1012(a)(1), maintaining that the provision "authorized the U.S. Secretary of Transportation to make federal funds available for certain limited types of state-tolled facilities," while Section 1012(a)(3) "established conditions that States were required to satisfy in order to qualify for federal funds."[17] (Id.)  Plaintiffs maintain that while Section 1012(a)(1) "continues to limit the use of revenue" on the part of States, it did not and does not "authorize[] States to operate their tolling facilities in a manner that violates the dormant Commerce Clause." (Id. at 47.)

Plaintiffs further argue that the Defendants' reliance on the Second Circuit decision in ATA II as authority for the proposition that Section 1012(a) of ISTEA expressly authorized Act 44/89's toll structure is inapposite because that case analyzed and relied on a separate section of

---

[17] Section 1012(a)(3) is codified at 23 U.S.C. § 129(a)(3). See supra note 7.

ISTEA – Section 1012(e), not Section 1012(a).  (Id.)  Plaintiffs maintain that Section 1012(e),

originally enacted as a Note to Section 129 but never codified, was specific to New York State in

authorizing tolls from the New York Thruway to be utilized to support the New York Canal

System, which was "functionally unrelated to the Thruway."  (Id. at 48.)  Accordingly, Plaintiffs

argue that ATA II "says nothing about whether Congress authorized – in the entirely independent

Section 1012(a) – any State or local entity in the country to remedy its local budget shortfalls

through unlimited, unconstitutionally-excessive tolls."  (Id. at 49.)

In further disputing Defendants' argument that Section 1012(a) constitutes express

congressional authorization insulating the Act 44/89 toll structure from dormant Commerce

Clause attack, Plaintiffs maintain that Defendants "place undue emphasis on their twenty-year-

old agreement with the [FHWA]."  (Id. at 51.)  Plaintiffs maintain that the FHWA Agreement

"goes no further" than Section 129(a)(3) in its purpose to "govern[] the use of federal funds

received by PTC and PennDOT," and because the FHWA "cannot authorize a violation of the

Commerce Clause,"  it "provides [no] independent justification for [Defendants'] actions."  (Id.

at 52.)

Finally, in disputing Defendants' argument that Congress expressly authorized States to

expend toll revenues in the manner contemplated by Act 44/89, Plaintiffs argue that even

assuming arguendo that Congress did so authorize States in Section 129(a), Defendants have

failed to comply with the statutory limitations placed on the exercise of that authority.  (Id. at

53.)  Specifically, Plaintiffs point to Section 129(a)(3)(A)(v) and argue that a State can use toll

revenues for "projects for which federal funds may otherwise be obligated" only "if the public

authority certifies annually that the tolled facility is being adequately maintained."  (Id. at 53)

(citing 23 U.S.C. § 129(3)(A)(v)).  Plaintiffs maintain that in its alternative motion for summary

judgment, the PTC Defendants fail to point to sufficient evidence of record "supporting its

contention that it has made <u>any</u> certifications as required under subparagraph (A)(v) of Section

129(a)(3)."  (<u>Id.</u> at 53-57.)  Accordingly, Plaintiffs maintain that even assuming that Section 129

permits Defendants to expend toll revenues in the manner contemplated by Act 44/89's toll

structure, the PTC Defendants have failed to meet their burden to produce admissible evidentiary

materials demonstrating their entitlement to summary judgment on this ground.  (<u>Id.</u> at 57.)

As it relates to their constitutional challenge to Act 44/89's tolling structure Plaintiffs

argue in sum that:

> there is a huge difference between "excess toll revenues" that could have been the
> subject of Section 1012(a)(3) and "excessive tolls" collected to fund a wide array
> of state-wide projects that are authorized, administered, and controlled by
> PennDOT, not PTC.  Even if Congress had opened the door for States to use toll
> revenues left over after the repayment of debt borrowed for the construction,
> operation, and maintenance of Turnpike (Senior Revenue Bonds), there is no
> support for the proposition that Congress ever envisioned that any State would
> fabricate a statutory scheme that requires a turnpike authority to raise toll rates with
> no limit to their amount or the time period they could be imposed to support the
> transfer of billions of dollars to State transportation departments (here PennDOT)
> to support projects with no functional relation to the tolled facility.

(<u>Id.</u> at 61-62.)[18]

---

[18]  Plaintiffs reference the distinction between Senior Revenue Bonds and Subordinate Revenue
Bonds, as alleged in paragraphs 59-64 of their complaint, and maintain that Turnpike tolls
expressly support only Senior Revenue Bonds, while Subordinate Revenue Bonds are issued for
the purpose of fulfilling the PTC's statutorily-mandated Act 44/89 payments to PennDOT,
arguing that there is "no support in any statute or statutory history . . . that suggests a 'clear and
unmistakable' authorization for PTC to cripple itself financially or to burden future generations
with debt incurred for purposes that are entirely unrelated to the Turnpike."  (Doc. No. 70 at 63.)

### 3.   Analysis

The Court has carefully considered the detailed and well-documented allegations of

Plaintiffs' complaint, as well as the extensive briefing and legal arguments of the parties.  As

outlined fully above, the factual predicates for Plaintiffs' claim are for the most part undisputed,

as the PTC tolls and expenditures are a matter of public record, as are the statutory origins of the

PTC's scheme for collecting toll revenues and transferring funds to PennDOT.  What is in

dispute is how five decades of slowly evolving federal law related to the dormant Commerce

Clause informs this Court's analysis of whether Plaintiffs' challenge to excessive tolls represents

a constitutional injury that this Court is empowered to rectify, or a matter for legislative

overhaul.

The Court notes that the parties maintain wholly different legal analyses of Plaintiffs'

dormant Commerce Clause claim.  It is no wonder.  Even the legitimacy and parameters of the

dormant Commerce Clause are the subject of continuous vigorous debate.[19]  The application of

the case law implementing the doctrine is no more conclusive.  As explained previously,

Plaintiffs urge this Court to invoke the analysis articulated by the United States Supreme Court

in Evansville/Northwest Airlines (see Doc. No. 70 at 27) (maintaining that "Evansville stands as

the appropriate test for analyzing excessive user fees and tolls"), while Defendants maintain that

the standard set forth in the earlier Pike decision is the appropriate standard to apply to Plaintiffs'

dormant Commerce Clause claim (see Doc. No. 76 at 17) (maintaining that in the Third Circuit,

---

[19] See Wayfair, 138 S. Ct. at 2100-01 (Gorsuch, J., concurring) ("The Commerce Clause is found
in Article I and authorizes Congress to regulate interstate commerce.  Meanwhile our dormant
commerce cases suggest Article III courts may invalidate state laws that offend no congressional
statute.  Whether and how much of this can be squared with the text of the Commerce Clause,
justified by stare decisis, or defended as misbranded products of federalism or antidiscrimination
imperatives flowing from Article IV's Privileges and Immunities Clause are questions for
another day.").

"Pike governs challenges to the constitutionality of highway toll programs").  Consequently, the parties in this case have characterized these tests as separate, competing standards within the world of dormant Commerce Clause jurisprudence, rather than two analytical frameworks that may complement, rather than replace, one another.  No definitive controlling precedent supports either side.  The Third Circuit has never specifically evaluated Evansville and Pike as competing tests in any Commerce Clause challenge to highway tolls, nor has the United States Supreme Court.  For the reasons that follow, upon review of all persuasive and controlling law, this Court finds that the relevant authority renders Pike the appropriate test for examining Plaintiffs' dormant Commerce Clause challenge.

Only two relevant cases in the Third Circuit address the applicability of Evansville or Pike to a dormant Commerce Clause challenge to a highway toll, Wallach v. Brezenoff, 930 F.2d 1070 (3d Cir. 1991), and Yerger v. Massachusetts Turnpike Authority, 395 F. App'x 878 (3d Cir. 2010).  First, in Wallach, the Third Circuit considered a challenge to a 50% toll increase on Port Authority of New York and New Jersey bridges and tunnels.  The New Jersey citizen plaintiffs brought a dormant Commerce Clause challenge asserting that "no toll increase was necessary to finance the maintenance or costs of the Port Authority's bridges and tunnels."  Wallach, 930 F.2d at 1072.  The Third Circuit affirmed the district court's dismissal of Plaintiffs' claim.  In so doing, the court looked to a similar challenge to the very same toll increase analyzed in Automobile Club of New York, Inc. v. Port Authority of New York & New Jersey, 706 F. Supp. 264 (S.D.N.Y. 1989), aff'd, 887 F.2d 417 (2d Cir. 1989).  Specifically, the Third Circuit affirmed the Automobile Club court's use of a three-part test derived from Hughes v. Oklahoma, 441 U.S. 322 (1979), to evaluate undue burdens imposed on interstate commerce by the toll increase, which was derived from Pike.  See Wallach, 930 F.2d at 1072;  see also Hughes, 441

U.S. at 336 (assessing "the burden imposed on interstate commerce" under the "general rule" established in Pike).  Although the Third Circuit resolved Wallach without a detailed analysis as to the issue of the governing test for assessing an undue burden claim under the dormant Commerce Clause, the case was decided using the Pike analysis.  See Wallach, 930 F.2d at 1072 (rejecting argument that the "toll increase is an unconstitutional tax on interstate commerce" for the "reasons given by the district court in the Automobile Club case," where the court applied the three-part test from Hughes in addressing a challenge to a toll increase under the dormant Commerce Clause, and analyzed "(1) whether the challenged toll increase had only incidental effects on interstate commerce, or discriminated against interstate commerce on its face or in practical effect, (2) whether the toll increase serves a legitimate local purpose, and (3) whether alternative means were available to promote this purpose without discriminating against interstate commerce").   As Plaintiffs note, the Wallach court cited Evansville, but only with regard to the plaintiffs' constitutional right to travel claim.[20]  See Wallach, 930 F.2d at 1072 (stating that "[t]he Court in Evansville devised a three-prong test for determining when a user fee impermissibly burdens a citizen's constitutionally protected right to travel").   Indeed, Wallach does not reference the applicability of Evansville as to a dormant Commerce Clause challenge, thus calling into question the applicability of Evansville to the case at bar.

Second, in Yerger v. Massachusetts Turnpike Authority, 395 F. App'x 878 (3d Cir. 2010), the Third Circuit, in a non-precedential opinion, affirmed the dismissal of a dormant Commerce Clause challenge to a discount toll program that offered toll discounts to subscribers of the Massachusetts Turnpike Authority ("MTA")'s electronic toll program, but not to users of

---

[20] As to Evansville's potential applicability to Plaintiffs' constitutional right to travel claim, see infra note 24.

competing systems in other states.  The court first concluded that the program did not

discriminate against interstate commerce on its face or in effect in that:  it was available on equal

terms to motorists regardless of residence;  it incorporated no distinctions based on residence;

and participation in the program was open to everyone, and that when a toll program does not

discriminate against interstate commerce on its face or in effect, Pike articulates the appropriate

standard for assessing any "undue burden" on interstate commerce.  Id. at 882-84.  While the

court acknowledged in a footnote that "the [challenged toll discount] also passes the Evansville

test for determining the validity of a levy or toll," id. at 884 n.3, the court ultimately applied Pike

to the challenged tolls in finding that there was no dormant Commerce Clause violation.

Because this reference to Evansville was not necessary to the court's reasoning, and, therefore,

constitutes dicta, this Court finds that Yerger provides no additional clarity regarding the

potential interplay between the Pike and Evansville tests with regard to the dormant Commerce

Clause challenge presently before this Court.

  In addition, it is noteworthy that Plaintiffs generally rely on case law from the First and

Second Circuits to support their argument as to the applicability of Evansville to their dormant

Commerce Clause challenge.  This Court, however, finds that those decisions do not adequately

explain the relationship between Pike and Evansville for purposes of Plaintiffs' claim.  In Doran

v. Massachusetts Turnpike Authority, 348 F.3d 315 (1st Cir. 2003), the First Circuit examined

the constitutionality of a discount tolling program and affirmed the district court's grant of the

defendant's motion to dismiss, finding no dormant Commerce Clause violation.  In Doran, the

plaintiffs made four arguments:  "(1) [t]hat the [discount toll program] imposes a nonuniform

and noncompensatory user fee unrelated to actual highway usage;  (2) [t]hat it is discriminatory

on its face or in practical effect; (3) [t]hat it does not serve a legitimate local interest unrelated to

economic protectionism;  and (4) [t]hat its cumulative effects on commerce, by shifting highway

costs to nonresidents, are excessive." Id. at 318.  In support of their first argument, the plaintiffs

relied primarily on American Trucking Associations, Inc. v. Scheiner, 483 U.S. 266 (1987),

where the Supreme Court examined the validity of a flat tax imposed by Pennsylvania on trucks

that varied according to whether the trucks were registered in-state or out-of-state, and described

the pertinent inquiry as whether the taxes discriminated against some participants in interstate

commerce, holding that "the Commerce Clause prohibits a State from imposing a heavier tax

burden on out-of-state businesses that compete in an interstate market than it imposes on its own

residents who also engage in commerce among States." Scheiner, 483 U.S. at 282.  In

addressing plaintiffs' first argument regarding the tolling program as a user fee, the Doran court

applied Evansville in concluding that there was no violation of the dormant Commerce Clause,

and as to the plaintiffs' third and fourth arguments, the Doran court stated that Pike is inapposite

where there is no showing that a non-resident pays a "disproportionate share of the state's

highway costs" compared to a resident.  Doran, 348 F.3d at 322.  The court stated, however, that

in the event Pike applied, the tolling structure also passed constitutional muster under the

associated inquiry.  Id.

Importantly, one district court in the First Circuit has described Doran as recognizing the

Pike and Evansville tests as "alternate tests, not substitutes for one another," and noted that

"[t]he Northwest Airlines test is applied when reviewing the constitutionality of a tax or penalty

imposed directly on interstate commerce.  The Pike test, on the other hand, is the test to be

applied when a concessionary benefit that incidentally impacts interstate commerce is granted to

in-state residents."  See Surprenant v. Mass. Tpk. Auth., No. 09-cv-10428-RGS, 2010 WL

785306, at *6 n.11 (D.R.I. Mar. 4, 2010).[21]  In addition, in Cohen v. Rhode Island Turnpike and Bridge Authority, 775 F.Supp.2d 439 (D.R.I. 2011), the district court emphasized that because the First Circuit in Doran applied Evansville/Northwest Airlines to a challenge to a discount toll program under the dormant Commerce Clause, the court was "not free to apply any other test to this case.  However, it must be noted that state and federal courts in Massachusetts have applied alternative tests in assessing similar challenges to the constitutionality of highway tolls."  Id. at 446 n.6.  In Cohen, after qualifying its use of Evansville, the district court ultimately concluded that under Evansville, the discount toll program did not violate the dormant Commerce Clause. Id. at 450.

Further, in Selevan v. New York Thruway Authority, 584 F.3d 82 (2d Cir. 2009) ("Selevan I"), the Second Circuit vacated the dismissal of a challenge to the New York Thruway Authority ("NYTA")'s toll discount program that charged non-residents of Grand Island tolls eight times greater than those charged to residents of Grand Island, concluding that the plaintiffs had established both Article III and prudential standing as to their dormant Commerce Clause claim.  Specifically, the Court of Appeals noted that the district court, after determining that plaintiffs failed to allege that the NYTA policy "discriminated" against interstate commerce, failed to inquire if the policy otherwise violated the Commerce Clause under Pike.  See Selevan I, 584 F.3d at 95.  The Second Circuit remanded the matter to the district court with instructions that the district court evaluate the tolls under the standard articulated in Evansville.  Id. at 96. The Second Circuit acknowledged that "the [Supreme] Court has not used the Northwest Airlines test to evaluate the constitutionality of a highway toll nor has it indicated whether the

---

[21] In Surprenant, the plaintiffs challenged on dormant Commerce Clause and right to travel grounds certain bridge and tunnel tolls that included discount programs that varied according to resident or non-resident status.  See Surprenant, 2010 WL 785306, at *3.

Pike test or the Northwest Airlines test should apply when highway tolls are challenged." Id.
The Court of Appeals further stated that it viewed "factors one and two of the Northwest Airlines
test [as] achiev[ing] the same end as Pike – the invalidation of state policies that impose an
undue burden on interstate commerce – inasmuch as they require the court to consider whether
the fee supplies a benefit to users of a facility that is at least roughly commensurate with the
burden it imposes on them." Id. at 97.  Accordingly, the court held that Evansville/Northwest
Airlines governed the analysis of the constitutionality of a highway toll under the dormant
Commerce Clause. Id. at 98.[22]

Finally, in assessing the unsettled landscape against which this Court is asked to make a
determination as to whether Pike or Evansville/Northwest Airlines applies to Plaintiffs' dormant
Commerce Clause claim, the Court notes that in neither Doran nor in Selevan I did the parties
characterize these tests as competing analyses from which the Court must select the more
appropriate standard to apply, as the parties do here.  (Doc. No. 70 at 74) ("Evansville, not Pike,
is the proper standard.");  (Doc. No. 56 at 11) ("[T]he correct test in the Third Circuit is the one
laid out in Pike.").  In Doran, as noted above, the parties (and the court) treated the tests as
potential alternative analyses, and in Selevan I, while the Second Circuit directed the district
court to apply Evansville on remand, there is no indication that the issue was actively litigated at

---

[22] The court acknowledged that the Second Circuit previously applied the Northwest Airlines test
to assess the constitutionality of a ferry passenger fee in Bridgeport & Port Jefferson Steamboat
Company, 567 F.3d 79 (2d Cir. 2009).  Following remand, the district court ultimately granted
summary judgment in favor of defendants, finding no violation of the dormant Commerce
Clause, and the Second Circuit affirmed this decision.  Selevan v. N.Y. State Thruway Auth.,
711 F.3d 253 (2d Cir. 2013) ("Selevan II");  see also Am. Trucking Assn's, Inc. v. N.Y. State
Thruway Auth., 199 F.Supp.3d 855 (S.D.N.Y. 2016) ("ATA I") (following Selevan I and
applying the Evansville/Northwest Airlines test to a dormant Commerce Clause challenge to a
trucking toll), order vacated on other grounds, 238 F.Supp.3d 527 (S.D.N.Y. 2017), aff'd, 886
F.3d 238 (2d Cir. 2018) ("ATA II") (finding that toll structure was expressly authorized by
congressional legislation and therefore invulnerable to dormant Commerce Clause attack).

the trial court level, ostensibly because the district court opinion focused almost entirely on the issue of standing.  Accordingly, the Court finds that neither the First nor the Second Circuit was faced with the same issue confronting this Court, rendering <u>Selevan I</u> and <u>Doran</u> only somewhat persuasive authority with questionable applicability to the precise question presented in the case at bar.

Moreover, during the pendency of this case, the United States Supreme Court announced "the analytical framework that now prevails for Commerce Clause cases" in <u>South Dakota v. Wayfair, Inc.</u>, 138 S. Ct. 2080, 2090, __ U.S. __ (2018).  In this case, which, importantly, did not involve a dormant Commerce Clause challenge to a toll or fee, the Court reiterated that the "two primary principles" governing a State's authority to regulate interstate commerce are that: "[f]irst, state regulations may not discriminate against interstate commerce, and second, States may not impose undue burdens on interstate commerce."  <u>Id.</u> at 2090-91.  As to "undue burdens," the Court stated that <u>Pike</u> sets down the appropriate standard for evaluating the existence of such a burden on interstate commerce imposed by law, providing that "[s]tate laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'"  <u>See</u> <u>Wayfair</u>, 138 S. Ct. at 2091 (quoting <u>Pike</u>, 397 U.S. at 142); <u>see also</u> <u>Dep't of Revenue of Ky. v. Davis</u>, 553 U.S. 328, 353 (2008) ("Concluding that a state law does not amount to forbidden discrimination against interstate commerce is not the death knell of all dormant Commerce Clause challenges, for we generally leave the courtroom door open to plaintiffs invoking the rule in <u>Pike</u>, that even nondiscriminatory burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice.").  While the Supreme Court recently emphasized the applicability of <u>Pike</u> generally,

this emphasis has generally appeared in the Third Circuit's recent dormant Commerce Clause

jurisprudence where a challenged law or program does not discriminate so as to favor in-state

residents or interests, as well.  See, e.g., Heffner v. Murphy, 745 F.3d 56, 72 (3d Cir. 2014)

(stating that in connection with a dormant Commerce Clause challenge "[i]f we determine that

heightened scrutiny is inapplicable because the [statute's] provisions do not discriminate in favor

of in-state interests, we then must balance interests pursuant to Pike").

Upon consideration of all of the above authorities, and noting the Supreme Court's recent

articulation of Pike as the standard governing dormant Commerce Clause challenges on undue

burden grounds, which comports with the limited precedent in the Third Circuit on this issue in

the context of highway tolls, the Court is persuaded that, as between Evansville/Northwest

Airlines and Pike, for purposes of the specific issue raised by the parties here, Pike provides the

appropriate test against which to assess the allegations of Plaintiffs' complaint in the context of a

dormant Commerce Clause challenge.

Having concluded that Pike governs Plaintiffs' dormant Commerce Clause claim, the

Court is required to assess, with regard to "[s]tate laws that 'regulat[e] even-handedly to

effectuate a legitimate local public interest,'" whether "'the burden imposed on such commerce

is clearly excessive in relation to the putative local benefits.'"  Wayfair, 138 S. Ct. at 2090-91

(quoting Pike, 397 U.S. at 142).  As noted above, this inquiry is appropriate where, as here,

plaintiffs do not allege that the challenged statute discriminates against interstate commerce, but

rather allege that the challenged statute imposes undue burdens on interstate commerce.  Pike

balancing requires a determination of "whether the [statute's] burdens on interstate commerce

substantially outweigh the putative local benefits."  Heffner, 745 F.3d at 71 (internal quotation

marks omitted).  The Third Circuit has described "[t]he 'incidental burdens' that we must assess

under <u>Pike</u>" as "consist[ing] of 'the degree to which the state action incidentally discriminates against interstate commerce relative to intrastate commerce.'" <u>Id.</u> at 73 (quoting <u>Norfolk S. Corp. v. Oberly</u>, 822 F.2d 388, 406 (3d Cir. 1987)). Accordingly, the Court examines the relative burdens on in-state and out-of-state interests, and where the challenged statute "imposes the very same burdens" on both sets of interests, it is a "burden on commerce without discriminating against <u>interstate</u> commerce." <u>Id.</u> (citing <u>Instructional Sys., Inc. v. Computer Curriculum Corp.</u>, 35 F.3d 813, 826-27 (3d Cir. 1994)).

Assessed against the above standard, the Court agrees with the PTC and Commonwealth Defendants that the tolls complained of (and governed by Act 44/89), alleged to burden in-state and out-of-state drivers on the Turnpike equally by charging them identical tolls, impose a burden on <u>commerce</u> as opposed to a burden on <u>interstate</u> commerce. This effectively disposes of Plaintiffs' dormant Commerce Clause challenge under <u>Pike</u>. <u>See</u> <u>Instructional Sys., Inc.</u>, 35 F.3d at 827 (reversing district court decision and holding that state statute did not impose a burden on interstate commerce under <u>Pike</u>'s balancing test because "although [the relevant statute] may burden commerce, it creates no incidental burdens on interstate commerce for purposes of <u>Pike</u> balancing," and "[i]n the absence of such a burden, an analysis of the 'putative local benefits' of [the relevant statute] is unnecessary"). Accordingly, the Court will grant the Commonwealth and PTC Defendants' motions to dismiss Plaintiffs' dormant Commerce Clause challenge.[23]

---

[23] The application of the <u>Pike</u> standard forecloses at this stage this Court's review of the substantial question as to whether Congress has specifically authorized the expenditure of toll revenues contemplated by Act 44/89, raised by the PTC and Commonwealth Defendants as an alternative basis for the dismissal of Plaintiffs' dormant Commerce Clause challenge. As detailed above, the parties agree that, even where challenged state action might otherwise violate the dormant Commerce Clause, if state action is specifically authorized by Congress, it is insulated from dormant Commerce Clause attack. Following this principle, in <u>American</u>

**B.  Plaintiffs' Claim that Act 44/89 Violates the Constitutional Right to Travel**

**1.  Applicable Legal Standard**

While the right to "travel" is not explicitly found in the Constitution, the United States

Supreme Court has stated that the "'constitutional right to travel from one State to another' is

firmly embedded in our jurisprudence." Saenz v. Roe, 526 U.S. 489, 498 (1999) (quoting U.S. v.

Guest, 383 U.S. 745, 757 (1966)).  That right "embraces at least three different components.  It

protects the right of a citizen of one State to enter and to leave another State, the right to be

treated as a welcome visitor rather than an unfriendly alien when temporarily present in the

second State, and, for those travelers who elect to become permanent residents, the right to be

treated like other citizens of that State." Id. at 500.  State laws implicate the right to travel (1)

when such laws actually deter travel; (2) when impeding travel is the primary objective of the

law;  or (3) when the law uses a classification that penalizes travel.  See Att'y Gen. of N.Y. v.

Soto-Lopez, 478 U.S. 898, 903 (1986) (internal quotations and citations omitted).

In United States v. Baroni, 909 F.3d 550 (3d Cir. 2018), the Third Circuit recently

acknowledged that while the Supreme Court has not recognized a constitutional right to

"intrastate" travel, this Circuit recognized such a right in Lutz v. City of York, 899 F.2d 255 (3d

Cir. 1990), where the court located a constitutional right to intrastate travel in the substantive due

process clause of the United States Constitution and held that a local ordinance outlawing

---

Trucking Associations, Incorporated v. New York State Thruway Authority, 238 F. Supp. 3d 527
(S.D.N.Y. 2017), aff'd, 886 F.3d 238 (2d Cir. 2018), the district court, having previously found
that a toll violated the dormant Commerce Clause, readily dismissed the challenge when
presented with specific congressional authorization for the funding scheme.  Id. at 540-41.  Here,
Plaintiffs test Defendants' blanket claim of congressional authorization, questioning whether
Defendants have complied with the limitations placed on the exercise of that alleged authority,
along with the source of congressional authorization itself.  However, as noted above, the
Court's conclusion that Plaintiffs' complaint fails to state a dormant Commerce Clause claim
under Pike renders the Court's resolution of this substantial question unnecessary at this time.

"cruising" was a reasonable time, place, and manner restriction on the right of localized intrastate

travel.  (Id. at 268-70.)  In Baroni, the Third Circuit noted that the First, Second, and Sixth

Circuits have also recognized a right to intrastate travel;  however, the court stated that "there is

hardly a 'robust consensus' that the right exists, let alone clarity as to its contours."  Baroni, 909

F.3d at 587-88.

### 2.  Arguments of the parties

#### a.  Commonwealth Defendants

At the outset, the Commonwealth Defendants highlight that, of the three recognized

components of a constitutional right to travel, only the "right of a citizen of one State to enter

and to leave another State" could "possibly be implicated" by the allegations in Plaintiffs'

complaint.  (Doc. No. 51 at 31.)  Therefore, the Commonwealth Defendants characterize

Plaintiffs' claim as asserting that "Act 44/89, by allegedly requiring Turnpike tolls above the

level necessary to fund Turnpike operations, actually deters interstate travel."  (Id. at 32.)  The

Commonwealth Defendants argue that paragraph 128 of Plaintiffs' complaint asserts only a

conclusory allegation to this effect without any factual support, and maintain that "the Supreme

Court has rejected the notion that a state-imposed fee on the use of interstate travel facilities

impermissibly burdens the constitutional right to travel," citing Evansville-Vanderburgh, 405

U.S. at 711-14.  (Id. at 33.)  Finally, the Commonwealth Defendants maintain that even assuming

that "the level of Turnpike tolls did somehow deter travelers from using the Turnpike, this would

not mean that the tolls (or Act 44/89) actually deter interstate travel in or through Pennsylvania,"

because the "right to interstate travel does not mean a traveler has a constitutional right to the

most convenient form of travel."  (Id.) (citing Town of Southold v. Town of E. Hampton, 477

F.3d 38, 54 (2d Cir. 2007) (stating that "travelers do not have a constitutional right to the most

convenient form of travel" (internal quotation marks omitted))).  The Commonwealth

Defendants argue that in light of the availability of "alternative toll-free routes" acknowledged

by Plaintiffs in their complaint (Doc. No. 1 ¶ 99), the allegations of Plaintiffs' complaint fail to

support a reasonable inference that Act 44/89 violates the constitutional right to travel (Doc. No.

51 at 34).

### b.  PTC Defendants

The PTC Defendants similarly argue that a "non-discriminatory burden like a highway

toll does not deter interstate travel in a constitutional sense," pointing out that Plaintiffs'

complaint indicates that alternative toll-free highways exist.  (Doc. No. 56 at 33) (citing Doc. No.

1 ¶ 99).  Along those lines, the PTC Defendants maintain that while drivers might prefer to use

the "convenient and more direct Turnpike," the imposition of "'burdens on a single mode of

transportation do not implicate the right to interstate travel.'" (Doc. No. 56 at 33) (quoting Miller

v. Reed, 176 F.3d 1202, 1205 (9th Cir. 1999) (stating that "[b]urdens placed on travel generally,

such as gasoline taxes, or minor burdens impacting interstate travel, such as toll roads, do not

constitute a violation of" the right to travel)).  The PTC Defendants argue that "[a]t most,

Plaintiffs have alleged a burden on traveling their chosen route through Pennsylvania, not on

their right to travel generally."  (Doc. No. 76 at 24.)  Accordingly, the PTC Defendants maintain

that the allegations of Plaintiffs' complaint fail to support a reasonable inference that the toll

structure imposed by Act 44/89 violates the constitutional right to travel.

### c.  Plaintiffs

In opposition to the arguments of the Commonwealth and PTC Defendants as to any

alleged violation of the constitutional right to travel resulting from Turnpike toll structure

established by Act 44/89, the Plaintiffs rely largely on Crandall v. Nevada, 73 U.S. (6 Wall.) 35

(1868), in which the Supreme Court invalidated a Nevada statute levying a "tax of one dollar upon every person leaving the State by any railroad, stage coach, or other vehicle engaged or employed in the business of transporting passengers for hire." Crandall, 73 U.S. at 36.  Plaintiffs argue that here, as in Crandall, the relevant issue is whether the toll levied is in any way comparable to the benefit provided, and that if it is not, "the constitutional violation is self-evident." (Doc. No. 70 at 38-39.)   Plaintiffs maintain that the Evansville/Northwest Airlines test is the relevant standard for determining "[i]f fees or tolls charged for use of a state-provided facility are reasonable and not excessive in comparison to the benefits provided to the payers for use of the facility" – or in other words, if they do not "offend the Constitution." (Id. at 39.)

### 3. Analysis

Upon careful consideration of the arguments of the parties, the relevant authorities, and the allegations of Plaintiffs' complaint, this Court is unpersuaded by Plaintiffs' argument that the allegations set forth in their complaint support a reasonable inference that the provisions of Act 44/89 constitute a violation of the constitutional right to travel.  As all parties appear to agree, the only component of the constitutional right to travel recognized by the Supreme Court ostensibly implicated by Plaintiffs' allegations is the "right of a citizen of one State to enter and to leave another State." See Saenz, 526 U.S. at 500.  Further, as all parties similarly appear to agree, because Plaintiffs' complaint makes no allegations that impeding travel is the primary objective of Act 44/89, or that Act 44/89 utilizes a classification that penalizes travel, Plaintiffs' claim is properly viewed as alleging that Act 44/89 actually deters travel.  However, as Defendants note, Plaintiffs' complaint does not allege that any traveler has been deterred from traveling through Pennsylvania by Turnpike tolls, but instead points to comments by the Pennsylvania Auditor General to the effect that travelers may seek alternative, toll-free routes through the

Commonwealth to avoid the payment of Turnpike tolls.  (Doc. No. 1 ¶ 99.)  Assuming the truth

of those allegations, the Court concludes that they do not amount to facts supporting a reasonable

inference that the constitutional right to travel has been burdened by the toll structure imposed by

Act 44/89;  rather, they support a reasonable inference that the right to travel a particular route

through Pennsylvania (i.e., the Turnpike) may at some point be deterred by the cost of Turnpike

tolls.  See Town of Southold, 77 F.3d at 54 (stating that a burden on the most convenient form of

travel is not a burden on the constitutional right to travel);  Miller, 17 F.3d at 1205 (stating that

"burdens on a single mode of transportation do not implicate the right to interstate travel").

     The Court is also unpersuaded by Plaintiffs' reliance on Crandall v. Nevada to support

their right to travel claim because in that case, as noted above, the Supreme Court struck down a

statute that levied a fee on every person leaving the state by way of a common carrier and

articulated its concern that, if the levy were permitted, "[s]tates covering the only practicable

routes of travel from the east to the west, or from the north to the south, may totally prevent or

seriously burden all transportation of passengers from one part of the country to the other."

Crandall, 73 U.S. at 46.  In contrast, Plaintiffs' complaint does not allege that the Turnpike is

"the only practicable route[] of travel" through Pennsylvania.  Moreover, based on subsequent

case law, the Court finds that a narrow construction of Crandall is appropriate.  See Lutz, 899

F.2d at 264-65 (noting that Crandall simply "recognized a right to travel insofar as travel is

necessary for the transaction of business between the national government and its citizenry," and

that the Supreme Court has declined to extend "Crandall into a generalized right of free

movement throughout the United States").  The Court finds that the allegations in Plaintiffs'

complaint fail to support a reasonable inference that the constitutional right to travel is burdened

by the toll structure of Act 44/89.[24]  Accordingly, the Court will grant the Commonwealth and

PTC Defendants' motions to dismiss Plaintiffs' constitutional right to travel claim.

## IV.   CONCLUSION

The Court has carefully reviewed Plaintiffs' complaint and the legal authority submitted

in support of the complaint.  Plaintiffs' complaint credibly alleges that Pennsylvania's policy

decisions related to transportation have resulted in a statutory scheme that disproportionately

burdens Turnpike travelers with the costs of a state-wide transportation system that is of no

direct benefit to them.  Evaluating Plaintiffs' well-articulated complaint applying established

Supreme Court and Third Circuit precedent that limits the breadth of the constitutional claims

asserted here, this Court is constrained to find that Plaintiffs' factual allegations do not support a

claim for violations of the dormant Commerce Clause or the constitutional right to travel.

Accordingly, for all of the reasons stated herein, the Court will grant the PTC Defendants' and

Commonwealth Defendants' motions to dismiss.  In light of the Court's determination that

Plaintiffs' complaint fails to state a claim upon which relief may be granted for violations of the

dormant Commerce Clause or constitutional right to travel, the Court need not address the

various immunity issues raised by individual defendants Shuey's and Lieberman's motions to

dismiss, and, therefore, those motions will be denied as moot.  Plaintiffs' motion for partial

summary judgment will also be denied.  An appropriate Order follows.

---

[24] Assuming Plaintiffs' complaint alleged a burden that implicated the constitutional right to travel, the Court is similarly unpersuaded by Plaintiffs' argument that Evansville/Northwest Airlines provides the appropriate test for evaluating any such burden.  As noted by Defendants, that test preceded the Supreme Court's decision in Saenz v. Roe, which articulated the elements of a constitutional right to travel claim.  See Ulmo v. Ohio Tpk. & Infrastructure Comm'n, 126 F. Supp. 3d 910, 918 n.4 (N.D. Ohio 2015) (rejecting the argument that "the test set forth in Northwest Airlines applies to [the] right to travel claim," and distinguishing Wallach's use of that test in that context on the basis that it "predates" the Supreme Court's decision in Saenz).